907 P.2d 1223 (1996)
80 Wash.App. 212
Vonnie JOHNSON, Appellant,
v.
The DEPARTMENT OF SOCIAL & HEALTH SERVICES, a State agency; J. Michael Smith, individually and in his capacity as Chief of the Office of Special Investigations, and J. Michael Smith, and "Jane Doe" Smith, husband and wife, and the marital community composed thereof; and Leslie James, individually and in his official capacity as Administrative Director, DSHS, and Leslie James and "Jane Doe" James, husband and wife, and their marital community, Respondents.
No. 17336-1-II.
Court of Appeals of Washington, Division 2.
January 2, 1996.
*1224 Elizabeth Pike Martin, Gordon Thomas Honeywell, Malanca, Peterson & Daheim, Tacoma, for Appellant.
*1225 Jeffrey A.O. Freimund, Office of Attorney General, Torts Division, Olympia, for Respondents.
HOUGHTON, Acting Chief Judge.
Vonnie Johnson appeals the trial court's summary judgment dismissal of his claims of racial discrimination, under RCW 49.60, and negligent infliction of emotional distress. Johnson filed these claims against the State of Washington, the Department of Social & Health Services (DSHS), and certain DSHS employees, after he was demoted from (and eventually reinstated to) his supervisory position for alleged sexual harassment and age discrimination. Johnson was demoted even though no formal complaint of sexual harassment or age discrimination was filed, and even though a Caucasian supervisor accused of sexual harassment was only given ninety days reduced pay. Johnson also contends the trial court erred in refusing to consider certain evidence presented for the first time at his motion for reconsideration. We affirm the trial court's summary judgment of dismissal of the negligent infliction of emotional distress claim, but reverse the trial court's dismissal of the discrimination claim and remand for trial.

FACTS
Johnson, an African-American in his mid-fifties, became a level I Investigator in the Office of Special Investigations (OSI) at DSHS in 1976. Johnson rose to a supervisory position in 1981, where he served until he was placed on the Reduction In Force (RIF) Register due to cutbacks in 1985; this meant he had priority in hiring. While Johnson was on the RIF Register, the chief of OSI retired; regional supervisor Mike Smith became chief; and another individual, a Caucasian male Investigator I (the comparator),[1] was appointed by Smith as acting regional supervisor in Region VI (Tacoma). Six months later, when it became time to appoint a permanent supervisor for Region VI, the comparator was initially appointed.
Johnson challenged this appointment because employees on the RIF Register have priority in hiring. Johnson was then appointed OSI Regional Supervisor of Region VI in 1988, displacing the comparator. It is unchallenged that Johnson was the only African-American supervisor in OSI.
It is also unchallenged that Johnson received positive personnel reports during his tenure in this position, that his Region was the most successful and productive in the state, and that he was never demoted, suspended, discharged or otherwise disciplined prior to the incident herein. In the last review before the problems involved herein began, the following was stated:
Performance as a Supervisor
You have set an example of excellence for your staff by volunteering and serving on many other projects, accepting assignments willingly and working hard on them.... You operate through subtle monitoring to ensure efficiency and quality. You are liked and respected by your staff and the other members of this organization. You have demonstrated your ability to function as an empathetic supervisor, while eliciting exceptional performance from your staff....
This August 1990 review was signed by J.M. (Mike) Smith, as evaluating supervisor, and by Leslie F. (Les) James, as "reviewer." Later reviews leave the "Performance as a Supervisor" portion blank (presumably because Johnson was removed from supervisory duties during this time), but they continue to be above average to excellent in all other areas. They also continue to "recommend promotion," and to include personal commendations for the outstanding manner in which Johnson conducted himself during the investigations discussed below.
On September 4, 1990, Johnson's secretary, Delores Nye, submitted a letter of resignation to Smith. This letter begins, "[t]he problem in the office has been with Loretta [Largen] and her failing to enter the correct time on her leave request sheets." Largen *1226 was a clerk/typist in Johnson's office. Nye's letter discusses various improper acts by Largen, and Johnson's "preferential treatment" of Largen. She mentions an incident wherein she confronted Johnson regarding his entering three and one-half hours on Largen's leave slip, instead of the four hours Nye asserted Largen missed; another employee overheard this exchange and apparently told Largen. Largen complained to Johnson, and Johnson held a meeting in which Nye felt Johnson unfairly focused on her. She also notes that "this incident should [not] have been entered on [her] evaluation."[2]
Finally, Nye states Johnson "is not a good manager" because he deals with employees in a "sarcastic, denigrading [sic] and humiliating" manner. After noting she "just wanted [Smith] to know that this has been going on for the past 1½ years," she enclosed her resignation. Nye resigned although she was very close to retirement.
On the same day, September 4, 1990, Smith wrote a letter regarding Nye's "exit interview" to Les James. Smith stated Nye had been "harassed" by Johnson. Smith notes Nye was "shaking and upset." No specifics constituting sexual or age harassment are mentioned by Smith; rather, he states "[n]umerous other incidents, administrative in nature, were discussed by Ms. Nye at the exit interview." The letter focuses largely on Largen, and on Johnson's failure to discipline or properly supervise her. Smith also notes that Nye, who was once Smith's secretary, was afraid of Largen.[3] He therefore calls for a "6.01 employee investigation,"[4] but does not specify the subject or object of the investigation. At this point, investigations of Johnson for criminal acts, sexual harassment, and age discrimination were begun.
Three days later, September 7, 1990, Smith entered a memorandum "for [the] record" concerning "allegations against Vonnie Johnson."[5] This memorandum states the above allegations in greater detail, and adds new allegations, which Nye allegedly made during the exit interview. The new allegations against Johnson included (1) that he had lengthy conversations about "explicit sexual acts" on the phone with "some female," which "horrified, sickened, upset and disappointed" Nye; (2) that he stood in his doorway in front of Nye's desk, looking "down the hallway at the ladies from the State Patrol Organized Crime Unit, making sexual comments about them and rubbing the fly on his pants," which "humiliated, embarrassed and hurt [Nye] and caused her tremendous stress"; (3) that he made "cutting, cruel, mean and vicious" comments to Nye, including "`You're old and fat and ugly. Why don't you just leave so I can get a pretty young thing in here.'" Smith also states Nye found the "sexual overtones" in the office "simply stifling."
*1227 Smith's memorandum further states that a policy 6.01 criminal investigation had been initiated concerning Johnson, but again does not specify its objective. He also notes he met with Bob Conner, Director of DSHS Employee Services, as required by policy 6.01, and they agreed that the Office of Equal Opportunity (OEO) should handle the investigation of the "sex and age discrimination" allegations. Conner testified in his deposition that OEO is the subdivision of his department that ordinarily investigates discrimination allegations.
Despite the assignment of the harassment investigations to OEO, Smith notes that Jan Pfundheller, an OSI investigator, was immediately assigned to interview various persons regarding the sexual harassment charges. Pfundheller reported that Stan Aston, Commander of the Washington State Patrol (WSP) Narcotics Unit adjacent to Johnson's OSI office said, "every one of [the female employees in the Unit] has complained about the black guy who runs the [adjacent OSI] office...."[6] At this time Pfundheller was under the direct supervision and control of the comparator, the Caucasian supervisor whose job Johnson had taken; she therefore would make her final report regarding Johnson to the comparator.
Also, on September 7, 1990, Les James authorized Employee Services Director Conner to conduct a policy 6.01 investigation "relative to Vonnie Johnson and Loretta Largent [sic]." James' letter to Conner states, "Obviously, sexual and racial issues are involved and ... your staff ... should be doing the primary investigation." The same day, Conner sent James' memorandum to Myron Toyama, Acting Chief of the OEO, asking him to "initite [sic] an OEO investigation as you deem necessary." There was also a memorandum from Conner to Toyama dated September 10, 1990, stating "Mike [Smith] wants you to go first."
Toyama asked Jeri Van Dyk, an OEO investigator with extensive experience in discrimination investigations, to investigate Johnson. Van Dyk was told OSI would investigate "potential criminal allegations." She discovered, however, that Pfundheller had already spoken with most of the witnesses regarding the harassment issues, so she initially met with Pfundheller.[7] Pfundheller gave Van Dyk the impression Johnson had engaged in "serious, extreme, widespread misconduct." Van Dyk then interviewed over twenty witnesses, not including Nye.
*1228 Van Dyk concluded Johnson did not commit sexual harassment. She noted several specific allegations in her declaration:
(1) Johnson did not create a hostile work environment at the WSP, notwithstanding Commander Aston's alleged statement that all of the female WSP employees had complained about "the black guy,"[8] because none of them told Van Dyk her work environment was altered by Johnson.
(2) One of the allegations regarded Johnson's prior State employment, and was made by Helen Holm (LaBrie), who had worked for a private company, Teller Training Institute, located in a building in which Johnson had previously worked. According to LaBrie's testimony, Johnson "check[ed] her out," and one time grabbed her for a "millisecond"; she told him to stop and he did so; he never again attempted to grab her; moreover, she told Johnson's supervisor, Marty Manning, she could handle the situation. LaBrie did not work for the State or Johnson.
(3) Another allegation regarded Diane Weedon, who worked for Johnson as a clerk/typist at the OSI office from April to August 1988. She stated once when she was late for work, Johnson asked her if she had been up all night having "wild sex" with her husband. On three occasions Johnson rubbed her shoulders and began rubbing down her back, but she moved away; she never told him this bothered her. She never filed a complaint. After she left Johnson's office, he called her numerous times, asking to meet for lunch, which she did on two occasions, along with other employees. On the second occasion, Weedon alleges Johnson said "not that I think you're attractive or anything, I like you, and would you ... go to bed with me or would you sleep with me" when they were alone together. She declined, and Johnson did not pursue her thereafter. Van Dyk notes Johnson was neither Weedon's supervisor nor her co-worker when this conversation allegedly occurred. Nor is there any evidence Weedon's employment was affected in any way by any of these incidents.
(4) Having interviewed seven women employed at the WSP Narcotics Unit adjacent to Johnson's office, Van Dyk met with Lt. Broome on October 2, 1990, "to express to him [her] concern that the interviews of his employees did not support a finding of a hostile work environment and were directly contradictory [both] to what she had understood from Jan Pfundheller and to Mike Smith's memo to the file. The purpose of [the] meeting was to determine if there was any reason why [Broome's] employees would not be truthful...."
On October 18, 1990, as Van Dyk was preparing to write her findings, Toyama instructed her to discontinue working on the investigation. According to Van Dyk, she had never before been asked to terminate an investigation, and knows of no other time before or since when anyone in OEO was asked to do so. She was given no explanation. Although she was not asked to evaluate racial issues during her investigation, she "had some concerns during [her] investigation that Mr. Johnson's race may have played a factor." She noted Les James' observation that "`racial issues'" were involved, Smith's incorrect portrayal of Commander Aston's statements regarding "`the black guy,'" and two unidentified DSHS employees' opinions that Nye "had a problem with" Johnson's race.
On September 13, 1990, Johnson was "reassigned" to his residence pending completion of a 6.01 investigation regarding allegations of misconduct, "including sexual harassment alleged by a number of individuals." He was forbidden to return to or contact anyone at his office, was required to remain in his home during normal business hours, and was required to be available by telephone.
Pfundheller called Johnson on September 24, 1990, and asked him to appear at OSI headquarters on the afternoon of September 28, 1990, for an interview. Van Dyk called Johnson on September 26, 1990; they made *1229 an appointment to meet on the morning of September 28, 1990.
At his meeting with Van Dyk, Johnson learned for the first time the specific nature of the allegations against him. At Johnson's afternoon meeting with Pfundheller, however, she would not give Johnson the specifics of the allegations. She read Johnson his Miranda[9] warnings, which he refused to sign, and then he left.
After this, and after Van Dyk informed WSP Lt. Broome that she found no evidence of harassment, the Deputy Secretary for Management at DSHS, Robert Benson met with Bob Connor and Les James and determined that Pfundheller's OSI investigation of Johnson might constitute a conflict of interest. In an attempt to "ensure an unbiased investigation," Benson ordered that the investigation be turned over to the WSP.
The WSP Department of Internal Affairs received Pfundheller's existing file on October 5, 1990. The WSP investigators reviewed Pfundheller's files, summarized them, and reinterviewed six of the twenty witnesses: Diane Weedon, Susan Holman, Don Russel,[10] Kip Johnson,[11] Don Gregory[12] and Delores Nye. On October 25, 1990, the head of the investigation, George Wehnes, sent copies of the report to both the comparator and Deputy Secretary Benson with a notation that "There are some obvious holes in this investigation, but I don't think they are detrimental to the case ... the evidence is sufficient for Johnson to be interviewed." The WSP interviewed Johnson on November 20, 1990. Johnson denied each of the allegations[13] against him. The WSP eventually forwarded its summary report, without reaching any conclusions, on December 21, 1990.
On January 2, 1991, Smith sent Conner copies of the completed WSP and OSI reports.[14] Neither report found any substantiation of the purported criminal activities regarding "[m]isuse of state time." Pfundheller's report did, however, find that Johnson sexually harassed women employed by DSHS and WSP; harassed Nye due to her age; violated a policy regarding reporting of outside work;[15] and violated the confidentiality of DSHS cases and the privacy of DSHS clients by allowing Largen's thirteen-year-old daughter to photocopy files for her mother.
Nonetheless, Smith and his deputy chief, Bruce Baker, met with Johnson and the attorney who then represented him to tell Johnson he would be reinstated on January 8, 1991. Smith's notes of the meeting state Johnson was told that "[p]erhaps" he did not engage in sexual harassment, but he did *1230 upset some of the women involved. Smith further notes he would write a PCR, but not ask for termination or demotion. Smith's notes also indicate that he did not promise that no disciplinary action would be taken and that Johnson was told it was "[r]easonable to anticipate some action" following the PCR.
Johnson returned to his Regional Supervisor position the next day, January 9, 1991, nearly four months after he was first placed on home assignment. The same day, he received three PCRs.[16] Prior to this, Johnson's only information regarding the allegations against him had come from Van Dyk, and he was "surprised" by the PCRs because no female employee of his had ever told him he had offended her. Johnson responded to the PCRs in writing, noting that most of the harassment allegations regarded women not under his supervision or even employed by DSHS; that those few who were employed by DSHS did not file complaints or even tell him they were offended; that the misuse of funds allegations were found unsupported by both investigations; and that Nye's allegations arose from his joking that she should retire, to which she would say "`Oh, so you could hire a young, cute blond secretary?,'" to which he would reply "`I don't like blonds.'"
The PCRs were referred for review to Richard Verme, Manager of the Medical Audit Team, who agreed with the two PCRs involving sexual harassment[17] and age discrimination, and the one regarding breach of confidentiality, but found the PCR regarding misuse of state time unsubstantiated. Based upon this report, DSHS demoted Johnson from his supervisory Investigator 3 position to an Investigator 1 position on February 21, 1991, effective March 11, 1991.
Johnson appealed to the Personnel Appeals Board. Initially, he challenged the sufficiency of the letter demoting him. On November 20, 1991, over eight months after his demotion, the Board set aside the demotion due to DSHS's failure to give Johnson the specifics of the allegations. The Board ordered DSHS to reinstate Johnson with full back pay and benefits. Six days later, November 26, 1991, DSHS issued a more complete letter, again demoting Johnson. This letter relied completely on Pfundheller's investigation.
Johnson again appealed to the Personnel Appeals Board. After a contested hearing, at which most of the witnesses testified in person or by testimonial deposition, the Board entered findings of fact. The findings largely contradicted DSHS's assertions and concluded that DSHS failed to substantiate its assertions that Johnson's conduct constituted cause for discipline. Johnson was again ordered reinstated to an Investigator 3 position with full back pay and benefits on July 24, 1992. DSHS did not appeal this determination.
Smith apparently refused to reinstate Johnson to his supervisor position in Region VI, which had been given to the comparator.[18] Instead, DSHS created a new position for Johnson as manager of the Food Stamp Trafficking Control Unit, with only three persons under his supervision (compared to eleven at Region VI) and no personal secretary. *1231 This makes Johnson the only manager in OSI without a personal secretary.
For purposes of Johnson's race discrimination claim, Johnson's treatment must be compared with that of the comparator. After an OSI investigation, during which the comparator was placed on home assignment for one and one-half months, OSI concluded that the comparator had sexually harassed and retaliated against a subordinate, and had used discriminatory practices with other employees. OEO also conducted an investigation and concluded that the comparator's conduct did not constitute sexual harassment under its guidelines. The WSP was never asked to participate in the investigation of the comparator.
A PCR was initiated against the comparator. As a result, the comparator was given ninety days reduced pay. Although, the disciplinary letter states that the comparator would not be reassigned to supervisory duties, the comparator testified by deposition that during the ninety day reduced pay period he was never removed from supervisory duties, was not demoted, and did not change duties except that he no longer supervised the sexually harassed employee. Moreover, DSHS does not contradict Johnson's assertion that the comparator was given Johnson's job.
Johnson filed his complaint on January 16, 1992. DSHS moved for summary judgment of dismissal. The trial court granted DSHS's motion. Johnson moved for reconsideration. Numerous documents were submitted by both parties. The trial court declined to consider additional evidence, and affirmed its ruling. Johnson appeals.

ANALYSIS
This court engages in the same inquiry as the trial court when reviewing a summary judgment, construing all facts and reasonable inferences therefrom most favorably to the non-moving party. Sellsted v. Washington Mut. Sav. Bank, 69 Wash.App. 852, 857, 851 P.2d 716, review denied, 122 Wash.2d 1018, 863 P.2d 1352 (1993). Summary judgment should only be upheld if no genuine issues of material fact are presented, and the moving party is entitled to judgment as a matter of law. CR 56. It has been noted that summary judgment should rarely be granted in employment discrimination cases. deLisle v. FMC Corp., 57 Wash.App. 79, 84, 786 P.2d 839 (reversing summary judgment in age discrimination case due to issues of fact), review denied, 114 Wash.2d 1026, 793 P.2d 974 (1990) (citing Hillebrand v. M-Tron Indus., Inc., 827 F.2d 363, 364 (8th Cir.1987), cert. denied, 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989)).
RCW 49.60.180 establishes that discrimination on the basis of race by an employer is an unfair practice. Specifically, employers may not discriminate against "any person in ... terms or conditions of employment because of ... race...." RCW 49.60.180(3).[19] To establish a prima facie case of racial discrimination due to disparate treatment, as Johnson claims here, he must show DSHS "`simply treats some people less favorably than others because of their race....'" Shannon v. Pay `N Save Corp., 104 Wash.2d 722, 726, 709 P.2d 799 (1985) (quoting International Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977)). Johnson must show (1) he belongs to a protected class, (2) he was treated less favorably in the terms or conditions of his employment (3) than a similarly situated, nonprotected employee,[20] and (4) he and the nonprotected "comparator" were doing substantially the same work; if DSHS then proffers a legitimate, nondiscriminatory reason *1232 for its action (here, Johnson's alleged misconduct), then (5) Johnson must produce evidence indicating DSHS's reason is pretextual. See, e.g., Ellingson v. Spokane Mortgage Co., 19 Wash.App. 48, 54, 573 P.2d 389 (1978); see also Jones v. Kitsap County Sanitary Landfill, Inc., 60 Wash.App. 369, 371, 803 P.2d 841 (1991); see generally McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) (seminal case establishing general burden shifting framework).[21] One test for pretext is whether (1) an employee outside the protected class (2) committed acts of comparable seriousness (3) but was not demoted or similarly disciplined. See, e.g., Hiatt v. Rockwell Int'l Corp., 26 F.3d 761, 770 (7th Cir. 1994).
The first element is not in dispute. Johnson is an African American who had high performance ratings both before and after this incident. Nor is the second element seriously disputed, because Johnson's demotion two levels and removal from supervisory duties was obviously distinct from the comparator's $600 pay loss.[22]
DSHS argued below, however, and the trial court agreed, that the comparator and Johnson were not similarly situated in all respects. While DSHS does not dispute the fourth element, that Johnson and the comparator performed equivalent duties, it does argue that the acts for which Johnson and the comparator were disciplined were not "of comparable seriousness" as a matter of law.
This phrase originated in McDonnell Douglas, which, in analyzing "pretext," stated:
Especially relevant to such a showing would be evidence that white employees involved in acts ... of comparable seriousness to the [African-American plaintiff's acts] were nevertheless retained or rehired. [A discrimination defendant] may justifiably refuse to rehire one who was engaged in unlawful, disruptive acts against it, but only if this criterion is applied alike to members of all races.
411 U.S. at 804, 93 S.Ct. at 1825. The Supreme Court has further noted that,
as we indicated in McDonnell Douglas, an allegation that other "employees involved in acts against [the employer] of comparable seriousness ... were nevertheless retained..." is adequate to plead an inferential case that the employer's reliance on his discharged employee's misconduct as grounds for terminating him was merely a pretext.
McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 283 n. 11, 96 S.Ct. 2574, 2580 n. 11, 49 L.Ed.2d 493 (1976).
Ultimately, however, "`the question of an employer's intent to discriminate is "a pure question of fact."'" Sischo-Nownejad v. Merced Community College Dist., 934 F.2d 1104, 1111 (9th Cir.1991) (citing Lowe v. City of Monrovia, 775 F.2d 998, 1008 (9th Cir.1985), as amended, 784 F.2d 1407 (1986) (quoting Pullman-Standard v. Swint, 456 U.S. 273, 287-88, 102 S.Ct. 1781, 1789-90, 72 L.Ed.2d 66 (1982))); cf. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, ___-___, 113 *1233 S.Ct. 2742, 2753-54, 2756, 125 L.Ed.2d 407 (1993) (existence of intentional discrimination is ultimately a question of fact). Therefore,
Even if the defendant articulates a legitimate, nondiscriminatory reason for the challenged employment decision, thus shifting the burden to the plaintiff to prove that the articulated reason is pretextual, summary judgment is normally inappropriate.
Merced, 934 F.2d at 1111; see also Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994) (clarifying Merced). This is because pretext may be demonstrated by direct or indirect evidence, including evidence presented as part of the prima facie case. Carle v. McChord Credit Union, 65 Wash.App. 93, 102, 827 P.2d 1070 (1992). Where the evidence creates "reasonable but competing inferences of both discrimination and nondiscrimination," a factual question for the jury exists. Carle, 65 Wash.App. at 102, 827 P.2d 1070 (citing United States v. Stanley, 928 F.2d 575, 577 (2d Cir.), cert. denied, 502 U.S. 845, 112 S.Ct. 141, 116 L.Ed.2d 108 (1991)). In this case Johnson's evidence regarding the comparator "`necessarily ha[s] raised a genuine issue of material fact with respect to the legitimacy or bona fides of the employer's articulated reason for its employment decision.'" Merced, 934 F.2d at 1111 (quoting Lowe, 775 F.2d at 1009); see also Wallis, 26 F.3d at 889-90.
Applying these concepts to this case, we hold that the trial court erred in granting summary judgment. While some distinctions could be drawn between the behavior of the comparator and Johnson, they are insufficient to defeat a reasonable inference that Johnson was disciplined in part due to race. In cases involving race, as in those involving age,
The ultimate issue ... is whether age [or race] was a determining factor in the employer's decision ... [T]he employees's task at the summary judgment stage is limited to showing that a reasonable trier of fact could, but not necessarily would, draw the inference that age [or race] was a determining factor in the decision.
Sellsted, 69 Wash.App. at 860, 851 P.2d 716.[23] Turning summary judgment on such narrow questions as the distinction between the behavior of the comparator and Johnson defeats the fundamental concept of allowing discrimination claims to be decided on the merits.
Our holding renders the arguments regarding the trial court's refusal to consider additional evidence on reconsideration moot. In addition, Johnson is entitled to attorney fees. RCW 49.60.030(2); Carle, 65 Wash. App. at 110-11, 827 P.2d 1070.
Johnson also challenges the trial court's dismissal of his negligent infliction of mental distress claim. Another division of this court has recently ruled the State does not owe a duty to avoid infliction of emotional distress on its employees when responding to employment disputes. Bishop v. State, 77 Wash.App. 228, 234-35, 889 P.2d 959 (1995). In the absence of a duty, there is no cause of action. The trial court's analysis tracks DSHS's position, and is sound. Moreover, emotional distress is compensable in a discrimination action, Johnson's only claim, so Johnson does not need to rely on negligent infliction of emotional distress.[24]
The trial court's summary judgment of dismissal of Johnson's discrimination claims is reversed and remanded for trial on race discrimination. The trial court's summary judgment of dismissal of the negligent infliction of mental distress is affirmed.
MORGAN, J., and RONALD COX, J. Pro Tem., concur.
NOTES
[1] "The comparator" was the Caucasian male employed by OSI in a similar position to Johnson, who was also accused of sexual harassment, but received different treatment. All records regarding the individual identified as the comparator were sealed below via stipulated protective order. Although we have carefully considered these records, we address them in this opinion in a general manner, and only to the extent necessary to make our analysis clear.
[2] Nye's August 1990 evaluation does not, however, mention this incident. The evaluation is largely above average to excellent, but does say Nye only "meets normal requirements" with regard to personal relations.
[3] The State asserts Smith's letter indicates Smith "wondered if Johnson was involved in ... anonymous [hang-up] phone calls[, which Nye received in the middle of the night,] because of [Johnson] and Largen's possible relationship." But, our review of the letter discloses that Nye "believes this is Loretta calling," and says nothing about Johnson's possible involvement.
[4] Policy 6.01 concerns criminal investigations, including "misuse of state funds," and requires compliance with Personnel Policies 545 and 546. Policy 6.02 concerns allegations of sexual harassment, and also requires such compliance. Policies 545 and 546 concern employee misconduct investigations, and require initiation of a Personnel Conduct Review (PCR) process within fourteen days, and completion within thirty days after the employee's response, unless policy 6.01 is invoked, which tolls the PCR time limits.
[5] At page 28 of his deposition, Smith testified that prior to writing this memo, he talked with Pat Nelson, OSI's personnel officer, about Nye's allegations. On the next page of the deposition, page 29, he testified he told Nelson everything he put in the memo. In the record submitted to the trial court, these pages are separated by pages 32-33 of the deposition. At deposition pages 32-33, Smith asserts he thought criminal activity might have occurred because (1) Johnson and Largen might have conspired to constructively discharge Nye, or (2) Johnson may have paid Largen for time she was not working. The State's brief to this court asserts Smith told Nelson which acts he thought were criminal. This misordering of the pages in the record creates a false impression. A proper ordering of the pages makes clear that Smith was not referring to his conversation with Nelson when he attempted to explain what conduct he thought was criminal.
[6] Commander Aston denied ever making this statement in his testimony at a subsequent Personnel Board hearing, stating he "d[id]n't believe that would have been a true statement." Rather, only one complaint had been made, by Susan Holman to Lt. Broome, for whom she worked. She said she was embarrassed by Johnson's "compliments" to her, stating she "look[ed] good," so Lt. Broome asked Johnson "to be cautious of the way he approached her and the things that he said." Johnson then told Holman "I don't care what [Lt. Broome] says, if I want to compliment you and think that you look very nice, I'm going to compliment you." Johnson testified to a similar version, noting further that when he told Holman about Lt. Broome's comment, she said "`Lieutenant Broome doesn't tell me who I can talk to.'"

In her testimony before the Personnel Board, Holman (1) described her initial relationship with Johnson as "[c]ordial"; (2) stated she would converse briefly with him when she would go down the hall to the bathroom between the offices and directly down the hall from Johnson's office; (3) stated Johnson sometimes "embarrassed" her by looking her up and down and saying she "look[ed] very good"; (4) stated she "casual[ly]" mentioned her embarrassment to Lt. Broome; (5) stated she did not think Johnson was attempting to "pick up on" her; and (6) stated Johnson never made "sexual like comments" to her.
Pfundheller's notes also reflect Aston told her that Lt. Broome told Johnson to stop harassing "the women" in the WSP office; again, Aston says this is false.
[7] Pfundheller's investigation notes indicate she extensively questioned numerous persons regarding the harassment charges beginning on September 6, 1990. Johnson's counsel moved below to strike all of Pfundheller's handwritten notes, however, because they are unsworn notes based entirely on hearsay and unsupported by affidavit. This motion was granted. This material has therefore not been considered by this court.

Subsequent WSP summaries of Pfundheller's notes were attached to Johnson's response below. Although these would seem as unreliable as Pfundheller's notes, Johnson's reliance on them below waived any objection as to them. See also Pfundheller's September 14, 1990 summary of her handwritten notes, which again was attached to Johnson's motion below, and therefore, is not objectionable.
[8] As noted above, Aston denied making such a statement, and stated such a statement would be false if made.
[9] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[10] Don Russel, who was an investigator in Johnson's office, gave testimony wholly favorable to Johnson. The WSP investigator largely discounted his testimony.
[11] Kip Johnson was Stan Aston's secretary. Before the Personnel Board, she testified she never spoke with Johnson except to say "hi"; Johnson never harassed her; he would stand at the end of the hallway looking, and when she would come down the hall to the bathroom, he would turn around and go into his office; and he never made any comments toward her.
[12] Don Gregory, another OSI investigator and an old friend of Johnson's from the military, attended the lunch with Diane Weedon after which Johnson allegedly propositioned her, but did not hear or see any improper behavior during their lunch.
[13] The other allegation not mentioned to this point concerned Shelly Denny, who was secretary to the manager of a different region, when she attended a lunch with Johnson and several other people in July 1990. Johnson allegedly offered to pay for her lunch, took her money and placed it in his pocket, and said she would have to reach in his pocket to get it back. He eventually gave her back the money. The incident made her uncomfortable because she felt the other, younger investigators present might think they could treat her the same way. She did not report the incident. Denny did work for Johnson for one month some time after this incident, and experienced no problems with Johnson.
[14] Despite a prior finding by Deputy Secretary Benson that Pfundheller's investigation involved a conflict of interest, it appears her report was relied upon in the following actions taken by DSHS.
[15] Largen had a night job as a janitor, which Johnson told her she did not have to report because it did not conflict with her State employment.
[16] Ultimately, it appears four PCRs were filed, corresponding to the four findings in Pfundheller's report regarding (1) Johnson making "personal sexual comments" to employees, "rubbing his crotch," and touching an employee of DSHS and a private company; (2) Johnson allowing Largen's thirteen-year-old daughter to photocopy files; (3) Johnson allowing Largen to take time off without requiring proper leave slips; and (4) Johnson making inappropriate and degrading comments to Nye regarding her age and retirement.
[17] Regarding employees of Johnson's, Verme cites to the statements of Nye and Weedon, discussed above, and to those of Viki Coan and Kathy White. Coan, who was a secretary for another investigator in Johnson's office, subsequently testified at the Personnel Review Board hearing that Johnson "check his zipper" often, which did not offend her, but if it offended others, he should stop. White, who did not work "for or with" Johnson as Verme asserts, but rather was a Criminal Intelligence Analyst at WSP down the hall, testified at the subsequent hearing that Johnson never did anything to offend her, but that he occasionally did a "package check" (apparently, she described this as a military term for a man adjusting his genitals through his clothing). This action did not offend White.
[18] DSHS does not challenge these assertions.
[19] The 1993 amendment to RCW 49.60.180, Laws of Wash.1993 chapter 510, § 12, changing the term "handicap" to "disability" has no impact on the statute's applicability in the instant case.
[20] DSHS argues Johnson must show "he was intentionally treated differently, due to his race, from a similarly situated non-black employee whose conduct was of comparable seriousness," citing generally, "McDonnell Douglas, supra." This is incorrect. The purpose of showing disparate treatment is to create an inference of discriminatory animus because direct evidence of discrimination is rarely available. Cf. Carle v. McChord Credit Union, 65 Wash.App. 93, 827 P.2d 1070 (1992) (affirming denial of directed verdict where no direct evidence of discriminatory intent was presented). Therefore, Johnson is not required to show both that he was treated differently than a similarly situated Caucasian and that the different treatment was based on race; if he could show negative treatment based on race, he would not need to show how other persons were treated. Cf. Teamsters, 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15 ("Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment").
[21] The McDonnell Douglas factors should be used flexibly to address the facts in different cases. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253-55, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981) (McDonnell Douglas burden shifting should be used flexibly to meet different fact situations; burden to show prima facie case "is not onerous"); Grimwood v. University of Puget Sound, Inc., 110 Wash.2d 355, 363, 753 P.2d 517 (1988) (McDonnell Douglas test to be used flexibly, or not at all). However, the McDonnell Douglas test need not be used, if it makes the analysis needlessly complex, or if the plaintiff chooses some other method to meet the burden of producing evidence that would allow the factfinder to find unlawful discrimination by a preponderance of the evidence. See, e.g., Parsons v. St. Joseph's Hosp. and Health Care Ctr., 70 Wash.App. 804, 809, 856 P.2d 702 (1993).
[22] While Johnson does not expressly argue the point, it is equally clear he has been treated differently than the comparator regarding subsequent assignments: The record indicates Johnson was given a limited supervisory position (three people) and no personal secretary, while the comparator was given Johnson's prior position (in which Johnson supervised eleven persons), and no other supervisor is without a secretary.
[23] After oral argument in the present case, the supreme court issued a decision holding that to prevail on a claim under RCW 49.60.180(2), a claimant must now prove that any of the statutory attributes was a "substantial factor" in the adverse employment decision, as opposed to a "determining factor." Mackay v. Acorn Custom Cabinetry, Inc., 127 Wash.2d 302, 310, 898 P.2d 284 (1995).
[24] After oral argument in this case, the supreme court issued a decision again recognizing that emotional distress is compensable in a discrimination claim. See Goodman v. Boeing Co., 127 Wash.2d 401, 407, 899 P.2d 1265 (1995).