IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| BRIAN LONG, | ) | No. 70529-6-I |
| Appellant, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| BRUSCO TUG & BARGE, INC., a | ) | |
| Washington corporation; BO | ) | |
| BRUSCO and his marital community, | ) | UNPUBLISHED OPINION |
| | ) | |
| Respondents, | ) | FILED: August 11, 2014 |
| | ) | |
| and | ) | |
| | ) | |
| BRUSCO MARITIME CO., a | ) | |
| Washington corporation, | ) | |
| | ) | |
| Defendant. | ) | |

BECKER, J. — Appellant Brian Long sued his employer, alleging retaliatory termination. Long appeals from a defense verdict. We affirm the challenged evidentiary rulings and conclude Long did not establish juror misconduct that would demand a new trial.

The respondent is Long's former employer, Brusco Tug & Barge. Brusco provides cargo barging and towing services at ports and at sea. Long began working at Brusco in 1995 as a deckhand. In 2007, Long accepted a position as

a ship assist captain with Brusco at the Port of Everett. In April 2009, Long was promoted to port manager for Brusco's operations at the Port of Everett.

In September 2009, Long hired Anthony Morgan as a deckhand. Morgan has a prosthetic leg. Long believed Morgan could handle the job, but chief executive offer Bo Brusco complained about the hire. Morgan filed a disability discrimination charge against Brusco with the Equal Employment Opportunity Commission later that month.

At the end of December 2009, Brusco terminated Long from his managerial position. Long's theory at trial was that Brusco terminated him in retaliation for hiring Morgan and opposing what Long claimed was Brusco's discrimination against Morgan. Brusco claimed that Long was terminated because of his mismanagement of an incident involving the ship *Sevilla* on December 21, 2009.

As port manager for Brusco, Long was responsible for ensuring all vessels were properly manned. He was expected to act as a second ship assist captain in the event that an incoming ship requested one. Long went on vacation on December 21, 2009. The *Sevilla* was scheduled to come into the Port of Everett that day at 4:30 p.m. with a single tug assist. Long testified that he had arranged for John Juker, his second-in-command, to captain the tug that would assist the *Sevilla* into port. He also testified that he had arranged for J.C. Anderson to be available to captain a second tug if the *Sevilla* needed one.

2

As it turned out, the *Sevilla* was delayed eight hours and did not arrive until after midnight on December 22. A second tug assist was needed, but Anderson was not available to captain the tug. David Brusco, Bo Brusco's son, ended up acting as second captain to assist the *Sevilla* into port. Brusco was unhappy that Long did not have a second tug assist lined up for the *Sevilla*.

On November 2, 2011, Long filed this suit alleging that Brusco unlawfully retaliated against him for opposing what he reasonably believed to be Brusco's discrimination against Morgan. Long argued the *Sevilla* incident was pretext. Trial began April 22, 2013. The jury returned a defense verdict, 10-2. Long appeals.

### Exclusion of comparator evidence

Long contends the court abused its discretion in excluding evidence that Brusco treated comparably situated employees less harshly.

To make a case for retaliatory termination, a former employee must show retaliatory motive for the alleged adverse employment action. Johnson v. Dep't of Social & Health Servs., 80 Wn. App. 212, 227, 907 P.2d 1223 (1996). Disparate treatment of similarly situated employees constitutes circumstantial evidence supporting a finding of retaliation. Johnson, 80 Wn. App. at 227. Individuals are similarly situated when they have similar jobs and display similar conduct. Vasquez v. County of Los Angeles, 349 F.3d 634, 640-41 (9th Cir. 2003). But the employees need not be identically situated. Earl v. Nielsen Media Research, Inc., 658 F.3d 1108, 1114 (9th Cir. 2011).

3

The trial court allowed comparator evidence as to Rich Nordstrom, Adam Wellenbrock, and David Brusco. Nordstrom was a tug captain who was not fired, though he failed to show up for many jobs and was once caught with alcohol on a ship in violation of Coast Guard regulations, and unable to captain. Wellenbrock was hired back after receiving several write-ups for, among other things, being absent and insubordination. David Brusco was not fired, though he was late for a ship assist while working as Brusco's port manager at the Port of Everett, resulting in a delay.

Long contends the court erred by excluding evidence as to Craig Petit, Nick Bernert, Joe Bromley, Corey Johnson, and Mark Guinn. Petit, a deckhand, was not fired, though he allegedly missed a job in September 2010 after being pulled over and questioned on suspicion of drunk driving. Bernert, an engineer, was rehired despite having previously delayed a ship run for eight hours by showing up late. Bromley, an ocean tugboat captain, was promoted to supervisor despite pleading guilty to misdemeanor assault. Johnson, a deckhand, missed a number of jobs but was not fired. Guinn, Brusco's manager in another location, was not immediately fired although his involvement in the discharge of dredged materials without a permit subjected Brusco to significant civil and criminal liability for oil spillage.

4

The trial court explained its rationale in a ruling made on April 22, 2013:

When we talk generally about deckhands or engineers, I think those are not analogous and would not be appropriate. When we talk about Mr. Guinn, the bay area manager, we're talking about the oil spill and he was, in fact, fired so it really doesn't seem at all analogous as well.

The next day, the court provided further explanation:

I have had a chance to take a look at the cases, and the cases do generally require that, for comparator evidence to be admissible, that there be a sufficient similarity in both . . . the jobs in question and the purported misconduct in question, such that the inference can be drawn if there was something more at play than simply discipline for that particular conduct.
. . . it doesn't have to be an identical situation either in terms of the purported misconduct or the job. It's a relatively flexible standard. The question is whether or not the inference can be drawn.

The court thus decided to exclude Long's proposed comparators who were involved in assaults, kidnappings, and oil spills, as well as those who were deckhands or engineers, as being not sufficiently similar.

Long contends the trial court's approach to admitting comparator evidence was too narrow. He argues that the excluded comparators caused or risked significant ship delay or else engaged in criminal conduct, yet they were not treated as harshly as he was.

A showing that the employer treated similarly situated employees more favorably can be probative of pretext. However, employees in supervisory positions "are generally deemed not to be similarly situated to lower level employees." Vasquez, 349 F.3d at 641. A company that places some level of managerial and supervisory authority in one individual may hold that individual to

5

a higher standard than those in whom less authority is vested. Treating employees who were involved in assaults and alcohol abuse less harshly than a manager who was unprepared for a tug assist does not give rise to a strong inference of pretext.

We find no abuse of discretion in the trial court's rulings on comparator evidence.

*Impeachment with prior inconsistent statement*

Long contends the trial court erred by refusing to let him impeach the testimony of Anderson with a recording of a statement Long made to his investigator.

A party may attack the credibility of a witness by impeachment with a prior inconsistent statement. ER 613. The test for inconsistency is determined by the whole impression or effect of the two statements, not by individual words or phrases. The question is whether the two utterances are inconsistent—do they appear to have been produced by inconsistent beliefs? State v. Dickenson, 48 Wn. App. 457, 467, 740 P.2d 312, review denied, 109 Wn.2d 1001 (1987).

Brusco's version of the events surrounding the *Sevilla* was that Long had not adequately prepared for the possibility that while he was on vacation, an incoming ship would need a second tug assist. Long's version was that he had arranged for Anderson to be available, and Anderson would have been available if the *Sevilla* had arrived on schedule. According to Long, Juker did not tell him the *Sevilla* was delayed, and thus, Long did not have the opportunity to make

6

calls and find a substitute. On October 29, 2012, while preparing for trial, a member of Long's attorney's office interviewed Anderson by phone and made a recording of part of the call. In the call, Anderson confirmed that Long had called him in late 2009 to see if he would be willing to cover a second tug job "if something came up in Everett." Anderson also said that he had previously spoken with someone at Brusco "about having permission to cover" a second tug job.

Anderson was questioned on direct examination in the plaintiff's case on April 24, 2013. When asked to confirm that Brusco employee Kevin Lehto or Tom Campbell had called to ask if he could assist Long as relief captain, Anderson answered that he never received a call from them. When asked about his prior statement to the investigator, Anderson said he was busy driving a boat at the time and did not pay much attention to the call. Long asked to impeach Anderson by playing a recording of that interview. The court refused, and the examination of Anderson proceeded. Anderson testified that he had once called Lehto to ask generally about the possibility of working with Brusco, but he did not pursue it because he was not interested at the time. Anderson remembered getting a call from Long, but "I told him that I could not do the job for him, that I wasn't interested in it, that I had other things." Presented with telephone call logs showing that he and Long had spoken on the phone for seven minutes on December 18, 2009, and two minutes on December 21, 2009, Anderson said he could not remember what was discussed on those particular dates.

7

Long contends the court abused its discretion. However, as the court explained, the answers Anderson gave in the recorded interview were not inconsistent with the answers he gave at trial. In the recorded interview, Anderson remembered having a conversation with Lehto, Long, or Campbell about getting authorized to cover a second tug job, but he did not say that Lehto or Campbell initiated the call. He remembered getting a call from Long, but he did not say he agreed to serve as a tug captain. The trial court properly exercised its discretion to refuse impeachment.

### Admissibility of the "Westwood notes" under ER 904

Long obtained a few pages of handwritten notes in production from Westwood Shipping, the *Sevilla's* owner. The notes obviously concern the *Sevilla* incident on December 21, 2009, but they are not self-explanatory. In a joint statement of evidence proposed under ER 904, Long offered the notes into evidence. ER 904, "Admissibility of Documents," provides that certain documents proposed as exhibits after appropriate notice "shall be deemed admissible" unless an objection is timely made. ER 904(b). Brusco timely objected.

The court refused to admit the notes. Long argues the evidence was "per se admissible" under ER 904.

During trial, Long filed a motion for a trial subpoena for a records custodian from Westwood Shipping. Brusco complained that the records custodian was unnecessary because authenticity of the documents was not in

8

dispute. Long noted that Brusco had also raised a hearsay objection and said the subpoena would be withdrawn "if they will stipulate that they're business records kept in the ordinary course of business." Brusco stipulated that the documents were business records.

Later, during the testimony of Juker, Long offered the notes into evidence as proof of the timeline of the *Sevilla* incident. He wanted to argue to the jury, based on the notes, that Juker failed to let him know about the *Sevilla*'s delay in time for him to call Anderson or make alternative plans for a substitute. According to Long, Brusco's stipulation removed any objection to the notes on the basis of authenticity or hearsay. Brusco responded that the stipulation was not to admissibility, and it only relieved Long of the responsibility of producing a custodian to prove the notes were business records. "Even if those handwritten notations were a business record for purposes of overcoming a hearsay issue, a records custodian still would not be able to describe what was meant by those notations."

Agreeing with Brusco, the trial court excluded the notes: "It takes an awful lot of explanation to try to see what the significance of the document might be. I think there's—I don't think a custodian could lay the foundation for it. It would have taken a witness to explain it in order to get that interpretation before the jury."

To support his argument that documents offered under ER 904 are "per se admissible," Long cites <u>Miller v. Arctic Alaska Fisheries Corp.</u>, 133 Wn.2d 250,

9

259, 944 P.2d 1005 (1997). Miller explains that there is a presumption of admissibility under ER 904. Where documents are timely offered in accordance with the rule, the rule creates an expectation of admission in the absence of a timely objection. Miller, 133 Wn.2d at 260. It is error to exclude documents on the basis of an objection that is untimely.

What Long overlooks is that objections to relevancy of a document need not be made until trial. ER 904(c)(2). At trial, Brusco objected to admission of the handwritten notes on the ground that they were meaningless without a witness who could explain them. While Brusco and the trial court did not explicitly use the word "irrelevant" to explain why the notes should not be admitted, lack of relevance was the problem. A meaningless document cannot be relevant. Long's plan to have counsel explain the notes in argument to the jury would not have been a fair or adequate substitute for some testimony providing a foundation for interpreting the meaning of the notes.

The trial court appropriately exercised its discretion to exclude the Westwood notes.

*Motion for a new trial*

After the defense verdict, Long moved for a new trial, alleging juror misconduct. Long obtained affidavits from jurors indicating that during deliberations one of the jurors made extensive comments based on his naval experience. The comments were to the effect that there was no way any maritime organization would have allowed a person with a prosthetic leg to work

as a deckhand and the juror was aware of the law and no law would permit it because of the safety risk. Long contends the trial court erred by denying his motion.

Appellate courts will generally not examine how the jury collectively or as individuals goes about reaching its verdict. Richards v. Overlake Hosp. Med. Ctr., 59 Wn. App. 266, 270, 796 P.2d 737 (1990), review denied, 116 Wn.2d 1014 (1991). An exception to this rule exists where a juror injects novel evidence into the deliberations. Verdicts are upheld unless (1) the affidavits of the jurors allege facts showing misconduct and (2) those facts support a determination that the misconduct affected the verdict. Richards, 59 Wn. App. at 271. Juror affidavits may be considered only to the extent that they do not attest to matters inhering in the verdict. Richards, 59 Wn. App. at 272. The individual or collective thought process leading to a verdict inheres in that verdict and cannot be used to impeach it. Richards, 59 Wn. App. at 272.

A trial court has discretion to grant or deny a new trial for juror misconduct, which will not be overturned absent an abuse of discretion. Richards, 59 Wn. App. at 271. A trial court abuses its discretion when its decision is manifestly unreasonable, exercised on untenable grounds, or for untenable reasons. Richards, 59 Wn. App. at 271. "'A strong, affirmative showing of misconduct is necessary in order to overcome the policy favoring stable and certain verdicts and the secret, frank and free discussion of the evidence by the jury.'"

Breckenridge v. Valley Gen. Hosp., 150 Wn.2d 197, 203, 75 P.3d 944 (2003), quoting State v. Balisok, 123 Wn.2d 114, 117-18, 866 P.2d 631 (1994).

Long cites six cases to support his argument that the juror committed misconduct. The first case is Adkins v. Aluminum Co. of America, 110 Wn.2d 128, 138, 750 P.2d 1257 (1988). In Adkins, jurors in a personal injury case looked up "negligence" and "proximate cause" in Black's Law Dictionary. The Supreme Court affirmed the trial court's decision to grant the motion for a new trial because Black's Law Dictionary definitions were extrinsic information not admitted into evidence at trial and the trial court did not abuse its discretion when it found that the extrinsic evidence affected the verdict. Adkins, 110 Wn.2d at 137.

The second case is Bouton-Perkins Lumber Co. v. Huston, 81 Wash. 678, 143 P. 146 (1914). In Bouton-Perkins, jurors consulted a pamphlet purporting to contain relevant Washington law during deliberation. The trial court denied a motion for new trial. The Supreme Court reversed and remanded with instructions to grant the motion for new trial because the pamphlet was extrinsic evidence.

This case is not like Adkins or Bouton-Perkins. The juror did not bring in any written material like a dictionary or a legal pamphlet. Although he spoke from notes, there is no evidence that he compiled the notes by consulting extrinsic evidence.

The third case is State v. Clausing, 147 Wn.2d 620, 56 P.3d 550 (2002). In Clausing, the Supreme Court reversed a criminal conviction after finding that an expert improperly testified on law, usurping the role of the trial judge. This case is not on point as it deals with trial court error in controlling the testimony of a witness, not an allegation that a juror brought in extrinsic evidence of law. As Adkins demonstrates, it is clear that a juror commits misconduct by bringing in extrinsic evidence of law. The question remains: did the juror in this case bring in extrinsic evidence of law? Clausing does not help to answer that question.

The fourth case is Fritsch v. J.J. Newberry's, Inc., 43 Wn. App. 904, 720 P.2d 845, review denied, 107 Wn.2d 1006 (1986). In Fritsch, a juror in a personal injury case told the other jurors that after he injured his foot and was unable to jog for a month, an attorney told him a reasonable sum for his pain and suffering was $1,000. The Supreme Court found juror misconduct because the juror injected evidence from outside the record and it affected a material issue in the case. Fritsch, 43 Wn. App. at 907.

The fifth case is Halverson v. Anderson, 82 Wn.2d 746, 513 P.2d 827 (1973). In Halverson, a teenager sued for personal injuries suffered in an auto accident. Only the question of damages was submitted to the jury. There was no evidence that the boy's earning capacity had been impaired, but the jury heard that he had an ambition to be a pilot and was studying to be a surveyor. During deliberations, one juror told the others that pilots generally make $2,000 per month and retire at age 40 and civil surveyors earn $1,500 per month. The

13

trial court granted a defense motion for new trial. The Supreme Court agreed that the juror had committed misconduct by bringing in extrinsic evidence and held that the trial court did not err in concluding that it influenced the jury's decision to award substantial damages.

The sixth case is Loeffelholz v. C.L.E.A.N., 119 Wn. App. 665, 82 P.3d 1199, review denied, 152 Wn.2d 1023 (2004). In Loeffelholz, a sheriff's deputy and county sued a variety of defendants, including a citizen's group, for defamation and malicious prosecution. The jury found for the plaintiff deputy as to the defamation claim and awarded $240,000 ($60,000 per defendant). Juror affidavits showed that the basis for the damage award was one juror's statement that "'he could figure out how much public servants earned and estimated Mr. Loeffelholz's average salary at $30,000.'" Loeffelholz, 119 Wn. App. at 679. The trial court granted a new trial as to damages. This court affirmed the ruling, relying on Halverson. The jury had not been instructed to consider loss of earning capacity, and the salary and retirement information placed by the juror before his fellow jurors "was wholly outside the evidence and not subject to scrutiny by either party." Loeffelholz, 119 Wn. App. at 683.

In Fritsch, Halverson, and Loeffelholz, evidence was deemed extrinsic because it was outside the scope of what had been discussed in court. In each case, a juror urged other jurors to consider assertions of fact that the disfavored party had no opportunity to rebut. That is not the case here. The juror's discussion echoed Bo Brusco's testimony about the liability the company would

14

be exposed to as the result of hiring Morgan to work on a boat when he had not passed a physical. The juror used his personal experience, not extrinsic evidence, to evaluate information received in court about Brusco's treatment of Morgan and Long's reaction to it.

This case is most like Richards, in which parents brought a medical malpractice action against the doctors who delivered their baby. The parents alleged the delivery team was negligent in the care of their newborn, resulting in severe neurological deficits. The defendants claimed the newborn's deficits were caused before the birth. During voir dire, a juror disclosed that she had medical training and worked with developmentally disabled children as an occupational therapist. The jury returned a 10-2 defense verdict. After the verdict, the plaintiffs brought a motion for new trial based on affidavits that the juror opined during deliberations that the mother's illness at 20 weeks could explain the infant's condition. The motion was denied. This court affirmed, concluding that the affidavits did not establish that the juror brought extrinsic evidence into deliberations. The court discounted the Richards' allegation that "the information imparted by juror Geisler was highly specialized and was uttered in the vein of being an expert." Richards, 59 Wn. App. at 274. What was more significant was that "on voir dire juror Geisler's background was fully disclosed and the Richards did not remove her from the jury." Richards, 59 Wn. App. at 274.

Here, as in Richards, the juror's background was disclosed in voir dire. At most, he stated in deliberations that he was unaware of any law that would

15

permit a person with a prosthetic leg to work as a deckhand. This was not a positive statement about the law, and it did not conflict with instructions given to the jury by the court. Even though the information the juror imparted may have been highly specialized and uttered in the vein of being an expert, it was his own thought process and it inhered in the verdict.

We conclude the trial court acted within its discretion by denying the motion for a new trial.

Affirmed.

Becker, J.

WE CONCUR: