[No. 13519-5-III. Division Three. March 9, 1995.]

PHYLLIS BISHOP, *Respondent*, v. THE STATE OF
WASHINGTON, ET AL, *Appellants*.

*Christine O. Gregoire, Attorney General,* and *Lori Lamb*
and *Delbert W. Johnson, Assistants,* for appellants.

*Kristian E. Hedine* and *Reese, Baffney, Schrag,* for respondent.

THOMPSON, C.J. — The Washington State Department of
Corrections (DOC) appeals a judgment awarding damages to
its employee, Phyllis Bishop, for negligent infliction of emotional distress. The judgment arose out of conflicts between
Ms. Bishop and her supervisor while both worked in the

mailroom at the Washington State Penitentiary in Walla Walla. DOC contends the conflicts involved workplace and personality disputes between employees which did not give rise to a cause of action for negligent infliction of emotional distress, and even if they did, Ms. Bishop was never placed in physical peril nor did she produce evidence of physical manifestations of mental distress. DOC also contends Ms. Bishop's sole remedy is provided by the state civil service law, RCW 41.06. We reverse and dismiss.

## FACTS

Ms. Bishop began working in the mailroom in 1984. Sergeant Vera Roop was her supervisor from 1986 until February 1991. In November 1989, Ms. Bishop became aware of circumstances that led her to believe another employee was stealing money from inmate mail. On the day she reported her concerns, Sergeant Roop was not at work. Ms. Bishop reported the incident to Officer Erdman and to Sergeant Roop's supervisor, Captain Morgan. She later spoke with the superintendent of the penitentiary. An investigation ensued and a series of meetings took place. However, Ms. Bishop was not satisfied with her employer's response or with Sergeant Roop's reaction to her.

On October 25, 1990, Ms. Bishop commenced this lawsuit against DOC, its secretary Chase Riveland, in his individual and official capacities, and Sergeant Roop, in her individual and official capacities. She alleged violations of the Consumer Protection Act (RCW 19.86), retaliatory action in violation of RCW 42.40, negligent infliction of emotional distress and intentional infliction of emotional distress. In February 1991, Sergeant Roop was transferred to another position at the penitentiary.

In May 1993, Defendants moved for summary judgment. Prior to hearing, Ms. Bishop stipulated to the dismissal of her Consumer Protection Act and retaliatory action claims, as well as her claims against Secretary Riveland individually. The trial court granted dismissal of Ms. Bishop's intentional infliction of emotional distress claim but denied

Defendant's motion to dismiss her claim for negligent infliction of emotional distress. Sergeant Roop was dismissed as a party by stipulation. The case proceeded to jury trial against DOC solely on the cause of action for negligent infliction of emotional distress.

At trial, Ms. Bishop testified that Sergeant Roop was mad at her for reporting the theft to Captain Morgan and refused to discuss the memo she had prepared at his direction. She said that once Captain Morgan turned the investigation over to Sergeant Roop, the sergeant's attitude toward her changed. Ms. Bishop gave the following examples:

> When you get a phone call, normally she would say, "Phone, Phyllis." You take the phone because there were two phones there, and she would usually answer in her office.
>
> . . . .
>
> A: [After the report] She would scream, holler, slam the phone down. Towards the end she got so she'd just leave it off the hook and not hang it up.
>
> Q: Now, you said she would scream or holler. What do you mean by that?
>
> A: She hollered my name.
>
> . . . .
>
> Q: Did this happen more than once?
>
> A: Yes.
>
> . . . .
>
> Q: Was that the only thing that happened between you and Vera Roop that made you think her attitude towards you had changed?
>
> . . . .
>
> A: Well, there's always an extreme amount of work out there to do in the mailroom, and there is something that you can do all the time. Well, she had put me on packages. Then take me off and put me back on the books. There's just not enough work to do there. So 2:00, 2:30, you are out of work. And I would go to her and I would say, "I need some work to do. Can I help one of the other people?" And she would say, "No." And I'd say, "What do you expect me to do? What do you want me to do?" And she says, "Stay busy."
>
> . . . .
>
> A: . . . Well, to stay busy, I had to stay busy and could not help anybody, so I would dust. I would sweep the floor. . . .
>
> . . . .
>
> Q: Were there other things that happened that made you think there was a change in your relationship with Vera Roop?

A: At some of my work, like if I was throwing mail[1] or if I was trying to do something different, she would come behind you and she would stand there and huff.

. . . .

Q: Did she say anything when she would do that?

A: Usually not. Her body language would show it. . . .

. . . .

Q: Were there other incidents besides what you have described so far, other things that happened?

. . . .

A: Yes. She would say something about clothing I would wear. And I had already worn it to work before. And she would come up and it was what I had on when I wore it before.

. . . .

A: Like I had this pink top, and she come up and says, "Why in the world do you have that top on?" And I looked at her and I said, "I have wore that before." And she said, "Well, it's not appropriate. It's not appropriate to wear here."[2]

. . . .

Q: Were there other things that happened?

A: Yes. She would single you out if you did something wrong, whereas always before she did not single you out.

. . . .

A: . . . Little sort of nit-picky things. If something wasn't done right, it was like time to chew me out, when before she would be helpful, explain things. And after a three day weekend, I came to work one day and she says, "You are going to be doing something different." I said, "What am I going to be doing?" And she says, "You are going to throw the bulk mail." And the bulk mail consists of a job that Officer Erdman usually did. And it was mail bags lined up that you put papers, magazines, rolled up newspapers tight in. And I said, "Fine. Do you have some kind of procedure for me to go by?" And she said, "No." And I said, "Do you have someone to show me how to do it?" I said, "I have never done it before and I don't want to mess up. That's messing up a lot of newspapers." And she said, "You do the best you can." And I mean, after a three day holiday, it's bad.

Superintendent Blodgett testified that Ms. Bishop contacted him regarding the theft incident and indicated she

---

[1]Ms. Bishop later explained that "throwing" the mail is a sorting process.

[2]Sergeant Roop and another employee testified that Ms. Bishop sometimes dressed in inappropriate ways (see-through skirt with nothing underneath it; high heel shoes which did not permit her to carry sacks and packages; backless shirt, no bra). Another employee testified that Ms. Bishop wore a shirt with an open back and Sergeant Roop told her to put her sweater back on.

might be very uncomfortable in the mailroom. He said they would try to help her and if she was interested in other positions in the facility, they would try to take steps to transfer her. He referred Ms. Bishop to the personnel office.

Superintendent Blodgett testified that Ms. Bishop did not meet minimum qualifications for other positions and there were no lateral positions available. However, Sergeant Roop was transferred in February 1991 because there were other positions available for her. He said DOC's collective bargaining agreement (CBA) allowed for Sergeant Roop's relocation. However, Sergeant Roop was angry at being transferred and filed a grievance.

Superintendent Blodgett testified that after Sergeant Roop was transferred from the mailroom, there were still problems between the employees and, from his perspective, the problems may have gotten worse. He brought in a superintendent from another correctional facility to evaluate the situation, interview employees, and make a recommendation.

Captain Morgan testified that he investigated Ms. Bishop's complaints. He said the issues in the mailroom were partisan, in that when he talked with one employee, they would back up the point of view of the side with which they were aligned. He said he did not believe there was any reason to discipline Sergeant Roop and he thought she was managing as best she could under the circumstances.

At the close of Ms. Bishop's case, DOC moved for directed verdict. The motion was denied. The jury found DOC was 67 percent negligent and Ms. Bishop was 33 percent negligent. A gross damage award for $4,891 was entered.

### Assignments of Error

DOC contends the trial court erred in denying its motion for summary judgment dismissing Ms. Bishop's claim for negligent infliction of emotional distress and in denying its motion for directed verdict. According to DOC, there is no cause of action against an employer for negligent infliction of

emotional distress arising out of what amounts to a workplace and personality dispute between employees.[3]

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

Washington first recognized the tort of negligent infliction of emotional distress in *Hunsley v. Giard*, 87 Wn.2d 424, 553 P.2d 1096 (1976), a bystander action.[4] *Hunsley* determined that a defendant has a general duty to avoid the negligent infliction of emotional distress. However, the court also recognized that emotional distress is "a fact of life" and there are limitations on one's liability. These limitations arise from the "very concept of negligence" and the established notions of duty, breach of duty, proximate cause, and injury. *Hunsley*, at 435, stated: "With adequate limitations, the courts can administer the adjudication of this tort just as it does the complex intricacies of products liability and medical malpractice."[5]

---

[3]DOC does not contend the exclusive remedy provisions of the Industrial Insurance Act, RCW 51.04.010 and RCW 51.32.010, bar Ms. Bishop's tort claim. Therefore, we do not reach this issue.

[4]Causes of action for negligent infliction of emotional distress may be divided into (1) direct actions and (2) actions brought by third parties or bystanders who experience emotional distress *as a result of injury to another. See* Julie A. Davies, *Direct Actions for Emotional Harm: Is Compromise Possible?*, 67 Wash. L. Rev. 1, 2 n.3 (1992); Daniel L. Keppler, Survey of Washington Law, *Torts:* Gain v. Carroll Co., *An Arbitrary Limit on Bystander Recovery*, 26 Gonz. L. Rev. 225 (1990-1991).

[5]Since *Hunsley*, courts have recognized the limitations of direct actions for negligent infliction of emotional distress. *See, e.g., Calhoun v. Liberty Northwest Ins. Corp.*, 789 F. Supp. 1540, 1548 (W.D. Wash. 1992) (routine discharge for poor work performance does not give rise to cause of action for negligent infliction of emotional distress); *Lords v. Northern Automotive Corp.*, 75 Wn. App. 589, 881 P.2d 256 (1994) (absent a "clear mandate of public policy", an employee has no cause of action against employer for negligent infliction of emotional distress when employment at-will is terminated); *Keates v. Vancouver*, 73 Wn. App. 257, 869 P.2d 88 (no cause of action for negligent infliction of emotional distress by person interrogated by police when interrogation could be terminated at will), *review denied*, 124 Wn.2d 1026 (1994); *Pepper v. J.J. Welcome Constr. Co.*, 73 Wn. App. 523, 871 P.2d 601 (neighboring landowners have no cause of action against developers for negligent infliction of emotional distress when development was not unreasonable and damages not foreseeable), *review denied*, 124 Wn.2d 1029 (1994); *Hitter v. Bellevue Sch. Dist. 405*, 66 Wn. App. 391, 832 P.2d 130 (discharged public school employee failed to demonstrate breach of any duty and failed to establish a prima facie case of negligent infliction of emotional distress based on employer's negligent investigation of complaints against him),

■ Under established notions of negligence, a duty is owed to others only with respect "to those risks or hazards whose likelihood made the conduct unreasonably dangerous". *Hunsley*, at 436 (quoting *Rodrigues v. State*, 52 Hawaii 156, 174, 472 P.2d 509 (1970)). Conduct is unreasonably dangerous when its risks outweigh its utility. *Wells v. Vancouver*, 77 Wn.2d 800, 810 n.3, 467 P.2d 292 (1970) (quoting *Raymond v. Paradise Unified Sch. Dist.*, 218 Cal. App. 2d 1, 31 Cal. Rptr. 847 (1963)).

■ As a matter of law, the conduct at issue here was not unreasonably dangerous. The utility of permitting employers to handle workplace disputes outweighs the risk of harm to employees who may exhibit symptoms of emotional distress as a result. The employers, not the courts, are in the best position to determine whether such disputes should be resolved by employee counseling, discipline, transfers, terminations or no action at all. While such actions undoubtedly are stressful to impacted employees,[6] the courts cannot guarantee a stress-free workplace. Therefore, we hold that absent

---

*review denied*, 120 Wn.2d 1013 (1992); *Waller v. State*, 64 Wn. App. 318, 824 P.2d 1225 (caseworker's investigation of allegations that plaintiff sexually abused his children did not give rise to claim for negligent infliction of emotional distress because conduct did not involve actual peril — physical harm), *review denied*, 119 Wn.2d 1014 (1992); *St. Michelle v. Robinson*, 52 Wn. App. 309, 759 P.2d 467 (1988) (victim of alleged child abuse did not state a cause of action for negligent infliction of emotional distress because if sexual abuse occurred, it was intentional); *Schwarzmann v. Association of Apartment Owners*, 33 Wn. App. 397, 655 P.2d 1177 (1982) (condominium owners had no cause of action against association's board members for negligent infliction of emotional distress relating to unforeseeable water damage). *But see Chambers-Castanes v. King Cy.*, 100 Wn.2d 275, 669 P.2d 451, 39 A.L.R.4th 671 (1983) (parties injured by failure of police to timely respond to repeated calls for help alleged facts giving rise to a special duty owed by police and trial court erred in dismissing cause of action for negligent infliction of emotional distress); *Corrigal v. Ball & Dodd Funeral Home, Inc.*, 89 Wn.2d 959, 577 P.2d 580 (1978) (sufficient facts alleged to state claim for negligent infliction of emotional distress by funeral home which sent plaintiff cremated remains of her son in a plastic bag sealed in a cardboard box and plaintiff, who was expecting remains to be in an urn, sifted through them thinking they were packing materials).

[6] We note that Sergeant Roop was dissatisfied with her transfer from the mailroom, just as Ms. Bishop was displeased that the transfer did not occur sooner.

a statutory or public policy mandate, employers do not owe employees a duty to use reasonable care to avoid the inadvertent infliction of emotional distress when responding to workplace disputes. Although Ms. Bishop contends such duty was recognized in *Wheeler v. Catholic Archdiocese*, 65 Wn. App. 552, 829 P.2d 196 (1992), *overruled on other grounds*, 124 Wn.2d 634, 880 P.2d 29 (1994), the conduct objected to in *Wheeler* involved discrimination prohibited by RCW 49.60.

As a nonexempt public employee, Ms. Bishop was entitled to the protections of RCW 41.06 known as the state civil service law. Although the doctrine of "primary jurisdiction" would not have precluded this lawsuit because money damages are unavailable under civil service law,[7] Ms. Bishop's use of its protections at the inception of the dispute might have resolved the matter before injury occurred. Further, Ms. Bishop was entitled to the benefits set forth in the CBA, including a grievance procedure which she failed to utilize.

We reverse and dismiss.

SWEENEY and SCHULTHEIS, JJ., concur.

---

[7]The doctrine of primary jurisdiction was described in *Kringel v. Department of Social & Health Servs.*, 47 Wn. App. 51, 53, 733 P.2d 592, *review denied*, 108 Wn.2d 1034 (1987) as follows:

"Primary jurisdiction" is a doctrine utilized by the judiciary in determining whether it should refrain from exercising its jurisdiction in deference to an administrative agency with special competence in a particular area and which has been charged by the Legislature with the authority to resolve, within a pervasive regulatory scheme, the issues that would be referred to it by a court. *In re Real Estate Brokerage Antitrust Litig.*, 95 Wn.2d 297, 622 P.2d 1185 (1980); *S.S. Kresge Co. v. Port of Longview*, 18 Wn. App. 805, 573 P.2d 1336 (1977).

*See also Kerr v. Department of Game*, 14 Wn. App. 427, 429, 542 P.2d 467 (1975), *review denied*, 86 Wn.2d 1013 (1976). An administrative agency is not accorded primary jurisdiction if it is powerless to grant the relief requested. *In re Real Estate Brokerage Antitrust Litig.*, 95 Wn.2d 297, 622 P.2d 1185 (1980).