10 P.3d 1104 (2000)
103 Wash.App. 75
Linda ROBEL, Respondent,
v.
ROUNDUP CORPORATION, d/b/a Fred Meyer, Inc., Appellant.
No. 18883-3-III.
Court of Appeals of Washington, Division 3, Panel Nine.
October 26, 2000.
*1106 Keller W. Allen, Witherspoon, Kelley, Davenport & Toole, Spokane, for Appellant.
Michael J. Walker, Delay, Curran, Thompson, Pontarolo & Walker, Spokane, for Respondent.
*1105 KATO, J.
Roundup Corporation appeals a judgment in favor of a former employee for disability discrimination, unlawful retaliation, outrage, negligent infliction of emotional distress, and defamation. It contends the facts do not support the superior court's conclusions as to each of these claims. We agree and reverse.
Roundup Corporation, which does business as Fred Meyer, Inc., operates a retail store on East Francis Avenue in Spokane. Linda Robel, the plaintiff in this case, began working in the store's service deli in May 1995. Ms. Robel noticed what she believed to be unsanitary and unhealthy food-handling practices in the deli, and she raised these concerns with other employees and deli management personnel. In December 1995, Ms. Robel began recording in a journal her concerns about the food-handling practices, about backdating of temperature chart entries, and about the general "dysfunctional"[1] nature of the deli workplace.
The next month, Ms. Robel had a falling-out with a deli coworker, Tiffany Ware. Ms. Robel disapproved of Ms. Ware's relationship with Ms. Robel's son, and the mutual animosity frequently spilled over into the workplace. Ms. Ware was a close friend of the deli's assistant manager, Amy Smith, and their friendship also carried over into the workplace.
In January and February 1996, Ms. Robel noted in her journal that Ms. Smith and the deli manager, Evelyn Potts, demonstrated favoritism toward Ms. Ware and certain other employees. Ms. Robel also noted "backstabbing" by management and the favored group, unhealthy food-handling practices, questionable purchases by management of meat and deli items, an increased workload on Ms. Robel, and a general awareness by certain employees that Ms. Robel was keeping the journal. In February 1996, Ms. Robel noted that Ms. Potts and Ms. Smith were making snide remarks about her food-handling and temperature-chart concerns, and that Ms. Potts was criticizing Ms. Robel's work and her conduct toward Ms. Ware and Ms. Smith. Ms. Robel also noted a significant increase in the workload to the point that the pressure was "unbearable." A coworker told Ms. Robel that Ms. Potts had instructed her not to talk to Ms. Robel at work. Ms. Robel noted that she was crying a lot, and her family was being affected. She wrote that she would quit the job if she did not need the medical benefits for her family.
On March 28, 1996, Ms. Robel's husband called the store's director, Steve Wissink, to report Ms. Robel's concerns. Mr. Wissink then met with Ms. Robel, who explained her concerns about the food-handling practices in the deli and the verbal and nonverbal harassment to which she was being subjected in the work setting. Tawnya Huntoon, another deli employee, also informed Mr. Wissink *1107 of her similar concerns regarding the food-handling practices in the deli. Ms. Huntoon's concerns about the deli work environment caused her to take a job in a different department at the store. Ms. Robel and Ms. Huntoon also reported their concerns to Glen Vaughn, third in charge of the store's food department (which included the deli).
After meeting with Ms. Robel and Ms. Huntoon, Mr. Wissink undertook an investigation and determined the food-handling allegations were not substantiated. Also after the meetings, deli coworkers whispered, laughed, and pointed at Ms. Robel, and the activities persisted.
The workplace atmosphere strained Ms. Robel's family life, she began to lose sleep and weight, and she began to withdraw from family relationships and activities. She lost at least 20 pounds, and her husband observed her sinking into depression.
In April 1996, Ms. Ware was awarded a 40-hour position in the deli. The United Food and Commercial Workers union successfully challenged this action on behalf of Ms. Robel, who then was given the job.
On May 8, 1996, Ms. Potts set up a meeting in the store's back room, purportedly to allow Ms. Robel and Ms. Ware to air their grievances face-to-face. Ms. Ware was in the room with Ms. Potts when Ms. Robel arrived, and Ms. Ware immediately began screaming and calling Ms. Robel a "fucking bitch" and other invectives. Ms. Potts eventually called the store's food manager, Bob Bogue. Mr. Bogue and Mr. Vaughn took the two employees further into the back of the store, out of earshot of customers and other employees.
In June 1996, Ms. Robel raised her concerns with her union representative, Ron Banka. Mr. Banka began to discuss these concerns with Ms. Potts, Mr. Bogue, and Mr. Wissink, but was not told of any action taken as a result.
On July 14, 1996, Ms. Robel injured her lower back while working at the deli and filed a timely worker's compensation claim. She was assigned light duty, which involved a four-hour shift standing at a display table outside the deli area and offering samples of food items to customers. On August 1, 1996, while Ms. Robel was at the display table, Ms. Ware and another deli worker laughed and acted out a slip and fall. Ms. Robel testified one of the coworkers yelled, "Oh, I hurt my back, L & I, L & I!" The coworkers also audibly called Ms. Robel a "bitch" and a "cunt" and told customers Ms. Robel had lied about her back and was being punished by "demoing" pizzas.
Ms. Robel reported these incidents to Mr. Banka, the union representative, who met with Mr. Wissink. Mr. Wissink then called a meeting of all deli workers on August 19, 1996. He told the employees that harassment would not be tolerated and could result in termination. Ms. Robel testified that the next day Ms. Ware and others laughed and audibly admonished each other not to harass Ms. Robel. Similar conduct and statements by Ms. Smith and others continued, at times in the presence of Ms. Potts. On September 13, 1996, Ms. Robel took a medical leave of absence.[2] As she was leaving, Ms. Smith said, "Can you believe it, Linda's gonna sit on her big ass and get paid."
Ms. Robel reported the continued harassment activities to Mr. Banka. On September 20, 1996, Mr. Banka again spoke to Mr. Wissink, who investigated the allegations and eventually fired Tiffany Ware.
Ms. Robel then filed this action against Fred Meyer, alleging disability discrimination, defamation, outrage, negligent infliction of emotional distress, and unlawful retaliation. The superior court denied Fred Meyer's motion for summary judgment. After a trial to the bench, the court entered factual findings outlined above. It also found:
17. Fred Meyer has a policy that requires all employees, inclusive of management personnel, to treat co-workers with dignity and respect.
18. Fred Meyer failed and/or refused to investigate and enforce this policy in response to the verbal and non-verbal harassment of Robel in the work setting, *1108 which continued for a period of months subsequent to March 28, 1996.
19. The verbal and non-verbal harassment of Robel in the work setting is imputed to Fred Meyer and causally related to her emotional distress.
....
30. Subsequent to the industrial injury of July 14, 1996, Robel was subjected to verbal and non-verbal harassment in the work setting by co-employees and Fred Meyer's management personnel, notwithstanding a directive to cease. In Wissink's opinion, Smith, Ware, and another employee disregarded that directive.
31. The verbal and non-verbal harassment of Robel in the work setting subsequent to July 14, 1996, was directly or proximately related to her disability and/or Fred Meyer's perception of Robel as disabled.
32. Fred Meyer has a policy that requires a work environment free from any type of discrimination. Fred Meyer failed or refused to enforce this policy in response to the verbal and non-verbal harassment of Robel in the work setting.
33. Fred Meyer has a policy that requires the company and its managers to immediately investigate all complaints of discrimination. Fred Meyer failed or refused to enforce this policy in response to the verbal and non-verbal harassment of Robel in the work setting.
34. Fred Meyer has a policy that retaliation by supervisors against employees is precluded when complaints are raised by employees. Fred Meyer failed and/or refused to enforce this policy in response to the verbal and non-verbal harassment of Robel in the work setting.
35. Fred Meyer's actions and/or inactions in regard to the verbal and non-verbal harassment of Robel in the work setting subsequent to July 14, 1996, was an unlawful act of retaliation in response to her filing and/or pursuing an industrial insurance claim under RCW 51, et seq., a statutorily protected activity.
36. The verbal and non-verbal harassment of Robel in the work setting subsequent to July 14, 1996, constituted an unlawful and adverse employment action against her.
37. There exists a direct causal connection between Robel's protected activity and the adverse employment action.
38. Fred Meyer, through the acts of its managers, participated, authorized, knew and/or should have known of the verbal and non-verbal harassment of Robel in the work setting subsequent to July 14, 1996.
39. The verbal and/or non-verbal harassment of Robel in the work setting subsequent to her industrial injury and disability is imputed to Fred Meyer.
40. Fred Meyer's remedial action to the harassment of Robel was not of such a nature to have been reasonably calculated to end the harassment. Its investigations and termination of Ware without further management corrections were inadequate.
41. The harassment of Robel in the work setting was unwelcomed.
42. Robel was limited to modified, light duty work in the deli as a direct result of her industrial injury and physical disability between July 26, 1996, and September 12, 1996.
43. Fred Meyer created a hostile and abusive work environment for Robel through its direct action and/or inaction regarding the ongoing verbal and non-verbal harassment of Robel in the work setting.
44. The hostile and abusive work environment created by Fred Meyer was offensive to Robel.
45. Fred Meyer had a duty to refrain from engaging in and/or allowing conduct by its employees that creates a hostile work environment.
46. Fred Meyer's management personnel improperly participated in and/or allowed the verbal and non-verbal harassment in the work setting.
47. Fred Meyer through its action and/or inaction allowed and/or fostered the verbal and non-verbal harassment in the work setting.
48. Fred Meyer discriminated against Robel in the terms and conditions of employment *1109 when it participated in and/or failed to bring an end to the verbal and non-verbal harassment of Robel in the work setting.
49. The verbal and/or non-verbal harassment of Robel in the work setting in relation to the industrial injury and disability is imputed to Fred Meyer.
50. Fred Meyer has a policy that harassment, threats, and intimidation involving one employee versus another is not tolerated. Fred Meyer failed and/or refused to enforce this policy in regard[ ] to the harassment activities of Robel in the work setting.
51. Fred Meyer's actions and/or inaction in regard to the verbal and/or non-verbal harassment of Robel in the work setting constituted extreme and outrageous conduct.
52. Fred Meyer's actions and/or inaction in regard to the verbal and/or non-verbal harassment of plaintiff in the work setting was intentional.
53. Fred Meyer's actions and/or inaction in regard to the verbal and/or non-verbal harassment of plaintiff in the work setting was negligent.
54. Fred Meyer owed Robel a duty of care in the work setting when it became aware of the verbal and non-verbal harassment.
55. Fred Meyer breached its duty of care to Robel.
56. The breach of duty of care was the proximate cause of Robel's injuries.
57. Fred Meyer's intentional acts injured Robel.
58. Fred Meyer's negligent acts injured Robel.
59. As a direct and proximate result of Fred Meyer's actions and/or inaction in regard to the verbal and/or non-verbal harassment of Robel in the work setting, she suffered severe emotional distress.
60. As a direct and proximate result of Fred Meyer's actions, Robel suffered physical manifestation of her emotional distress.
61. Subsequent to Robel's raising concerns as to the food handling practices in the service deli, Fred Meyer's employees, including Smith, made false and defamatory communications about Robel in the work setting.
62. Subsequent to Robel's industrial injury of July 14, 1996, Fred Meyer's employees, including Smith, made false and defamatory communications about Robel in the work setting.
63. The defamatory communications by Fred Meyer's employees included that Robel was a "bitch," a "cunt," a "fucking bitch," a "fucking cunt," a "snitch," a "squealer," and/or a "liar," and the comment that "only idiots demo."
64. The defamatory communications were published to Fred Meyer's customers and/or Robel's co-workers and/or Robel's management personnel.
65. Fred Meyer's management personnel were present when some of the defamatory statements were made, including the use of the terms "bitch" and "fucking bitch" and took no action in response to the same.
66. The defamatory communications made by Fred Meyer's employees are imputed to Fred Meyer.
67. As a direct result of the defamatory communications, Robel suffered emotional distress.
68. Fred Meyer has no privilege to protect it from liability for the defamatory communications and did not deny the statements were made.
69. As a result of Fred Meyer's actions, Robel sustained special damages totaling $1,902.50 for marriage counseling.
Based on these findings, the court concluded that Fred Meyer (1) discriminated against Ms. Robel on the basis of her disability; (2) unlawfully retaliated against her for filing and pursuing her industrial insurance claim;
(3) negligently inflicted emotional distress;
(4) intentionally inflicted emotional distress; and (5) defamed Ms. Robel. It also concluded that Ms. Robel suffered severe emotional distress as a direct and proximate result of Fred Meyer's actions. The court awarded special damages in the amount of $1,902.50 and general damages in the amount of $50,000. *1110 The court later entered judgment for these amounts, plus attorney fees of $35,000 and costs of $2,409.67, for a total of $89,312.17.
On appeal, both parties argue broadly about the nature and extent of an employer's liability for rancorous workplace disputes. Fred Meyer argues, for example, that the superior court essentially imposed a duty of civility in the workplace. Ms. Robel responds that Fred Meyer seeks impunity for vile, degrading, and discriminatory conduct in the workplace. Despite the sweeping allure of these arguments, we limit ourselves to the precise bases of the superior court's findings and conclusions.
A preliminary issue is the appropriate standard of review. Fred Meyer has not assigned error to the court's findings of fact. They therefore are treated as verities on appeal. See Davis v. Department of Labor & Indus., 94 Wash.2d 119, 123, 615 P.2d 1279 (1980); RAP 10.3(g). However, an appellate court is not bound by a trial court's designation of factual findings or legal conclusions; a finding of fact that is really a legal conclusion will be treated as a legal conclusion, subject to de novo review. Local Union 1296, Int'l Ass'n of Firefighters v. City of Kennewick, 86 Wash.2d 156, 161-62, 542 P.2d 1252 (1975); see Dempere v. Nelson, 76 Wash.App. 403, 406, 886 P.2d 219 (1994), review denied, 126 Wash.2d 1015, 894 P.2d 565 (1995).
The first issue is whether the superior court erred in concluding Fred Meyer discriminated against Ms. Robel on the basis of her physical disability. Washington's Law Against Discrimination prohibits discrimination against an employee "in compensation or in other terms or conditions of employment because of ... the presence of any sensory, mental, or physical disability." RCW 49.60.180(3). The superior court concluded Fred Meyer violated this provision by maintaining a hostile work environment based on Ms. Robel's physical disability resulting from her industrial injury on July 14, 1996.[3]
The parties have not cited any Washington case addressing a claim that an employer created a hostile work environment based on an employee's disability. However, several federal trial courts have held that the Americans With Disabilities Act, 42 U.S.C. § 12101-12213, encompasses hostile work environment claims.[4]See, e.g., Fox v. General Motors Corp., 94 F.Supp.2d 723, 726 (N.D.W.Va.2000); Williamson v. Int'l Paper Co., 85 F.Supp.2d 1184, 1187 n. 3 (S.D.Ala. 2000); Rodriguez v. Loctite Puerto Rico, Inc., 967 F.Supp. 653, 662-63 (D.Puerto Rico 1997); Hendler v. Intelecom USA, Inc., 963 F.Supp. 200, 208 (E.D.N.Y.1997); McClain v. Southwest Steel Co., 940 F.Supp. 295, 301 (N.D.Okla.1996); Henry v. Guest Services, Inc., 902 F.Supp. 245, 251 n. 9 (D.D.C.1995), aff'd, 98 F.3d 646 (D.C.Cir.1996); Haysman v. Food Lion, Inc., 893 F.Supp. 1092, 1106-07 (S.D.Ga.1995).
Assuming the Washington statute encompasses a hostile environment claim based on a disability, to succeed on this basis the claimant must demonstrate that the harassment was so severe and pervasive that it affected the "terms or conditions of employment." RCW 49.60.180(3).
Casual, isolated or trivial manifestations of a discriminatory environment do not affect the terms or conditions of employment to a sufficiently significant degree to violate the law. The harassment must be sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment.
Glasgow v. Georgia-Pacific Corp., 103 Wash.2d 401, 406, 693 P.2d 708 (1985); see Payne v. Children's Home Soc'y of Washington, Inc., 77 Wash.App. 507, 515, 892 P.2d 1102, review denied, 127 Wash.2d 1012, 902 P.2d 164 (1995).
Whether harassment affects the terms or conditions of employment is determined *1111 "by looking to the totality of the circumstances, considering factors such as `the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" MacDonald v. Korum Ford, 80 Wash.App. 877, 885, 912 P.2d 1052 (1996) (quoting Harris v. Forklift Sys. Inc., 510 U.S. 17, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993)). In MacDonald, the court held the sexual harassment was not actionable because it was not physically threatening and did not interfere with the employee's work performance. MacDonald, 80 Wash.App. at 887, 912 P.2d 1052.
Here, the only conduct that could form the basis of a handicap discrimination claim necessarily had to occur after Ms. Robel's injury. The trial court's findings refer specifically to only one incident in which Ms. Robel was harassed about her injury. That was the incident on August 1, 1996, in which coworkers laughed, acted out a slip-and-fall injury, and called Ms. Robel names. Another finding refers vaguely to "similar" conduct and statements, but does not indicate the conduct and statements were related to Ms. Robel's injuries.[5] However, even if these incidents were injury-related, they do not establish such a severe and pervasive pattern of harassment as to establish a hostile work environment. Considering the totality of the circumstances, they appear to be merely a continuation of the conduct that began several months before the injury. Moreover, the court's findings do not suggest that the incidents were physically threatening or that they affected Ms. Robel's work performance. The trial court erred in concluding Ms. Robel had proven Fred Meyer maintained a hostile work environment based on Ms. Robel's handicap.[6]
The second issue is whether the superior court erred in concluding Fred Meyer unlawfully retaliated against Ms. Robel for filing and pursuing her industrial insurance claim. The Industrial Insurance Act provides:
No employer may discharge or in any manner discriminate against any employee because such employee has filed or communicated to the employer an intent to file a claim for compensation or exercises any rights provided under this title.
RCW 51.48.025(1).
Because Ms. Robel was not discharged, her claim was based on the statute's phrase "or in any manner discriminate." In Johnson v. Safeway Stores, Inc., 67 Wash.App. 10, 13, 833 P.2d 388 (1992), the court held that "an employee has a cause of action in tort if... [an] employer successfully prevents the filing of a workers' compensation claim by threats and intimidation." See Warnek v. ABB Combustion Eng'g Servs., Inc., 137 Wash.2d 450, 459, 972 P.2d 453 (1999). As Ms. Robel points out, the case is not directly applicable here because she was not prevented from filing an industrial insurance claim. Nevertheless, the employee in Johnson, like Ms. Robel, claimed the employer threatened, intimidated, and coerced him regarding a claim for benefits. Johnson, 67 Wash.App. at 11, 833 P.2d 388. When the employee does not file a claim, he or she must prove:
(1) either (a) proof of a policy or practice of the employer, known to the employee, by which the employer retaliates against employees who exercise their rights under the workers' compensation law; or (b) that the employee sustains an on-the-job injury, and is directly threatened with retaliation if the employee claims benefits under the workers' compensation law for the injury; (2) that the employee fails to file a claim for workers' benefits within the required time period after the injury; and (3) that there is a causal connection between the failure to file the claim and the existence of *1112 the policy or practice under (1)(a) or the threats and intimidation under (1)(b).
Johnson, 67 Wash.App. at 13, 833 P.2d 388.
Obviously, elements (2) and (3) have no application when the employee files a claim for benefits despite the alleged threats or intimidation. However, element (1) would apply. In such a case, the employee still must establish either that the employer had a policy or practice of retaliating against employees who claim workers' compensation benefits or that the employer in his case directly threatened retaliation. Here, there is no evidence Fred Meyer had a policy or practice of retaliation. Nor is there any evidence of a direct threat of retaliation, even if Amy Smith is viewed as a manager whose actions are imputed to Fred Meyer. As the court in Johnson said, the threat must convey more than "a general impression that his employer might be unhappy if a claim were filed." Johnson, 67 Wash.App. at 14, 833 P.2d 388. Here, Ms. Smith's comments were not a direct or even an indirect threat and thus did not provide the prima facie proof required. The trial court erred in concluding Fred Meyer unlawfully retaliated against Ms. Robel for filing and pursuing her worker's compensation claim.
The third issue is whether the superior court erred in concluding Fred Meyer was liable for intentional infliction of emotional distress, or outrage. The Supreme Court recently described the tort of intentional infliction of emotional distress, or outrage:
Outrageous conduct is conduct "which the recitation of the facts to an average member of the community would arouse his resentment against the actor and lead him to exclaim `Outrageous!'" Browning v. Slenderella Sys., 54 Wash.2d 440, 448, 341 P.2d 859 (1959) (quoting RESTATEMENT OF TORTS § 46(g) (Supp.1948)). See also Dunn v. Moto Photo, Inc., 828 S.W.2d 747, 753 (Tenn.Ct.App.1991). That, however, is not the test for a tort of outrage claim. To establish a tort of outrage claim, a plaintiff must show (1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) severe emotional distress on the part of the plaintiff. Dicomes v. State, 113 Wash.2d 612, 630, 782 P.2d 1002 (1989) (citing Rice v. Janovich, 109 Wash.2d 48, 61, 742 P.2d 1230 (1987)).
Reid v. Pierce County, 136 Wash.2d 195, 201-02, 961 P.2d 333 (1998); see Grimsby v. Samson, 85 Wash.2d 52, 59-60, 530 P.2d 291, 77 A.L.R.3d 436 (1975).
To support an outrage claim, the plaintiff must prove that the defendant's conduct was "`so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Dicomes v. State, 113 Wash.2d 612, 630, 782 P.2d 1002 (1989) (quoting Grimsby, 85 Wash.2d at 59, 530 P.2d 291) (emphasis omitted). Tort liability "`does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.' In this area plaintiffs must necessarily be hardened to a certain degree of rough language, unkindness and lack of consideration." Grimsby, 85 Wash.2d at 59, 530 P.2d 291 (quoting RESTATEMENT (SECOND) OF TORTS § 46, cmt. d (1965)).
Whether conduct is sufficiently outrageous to satisfy the first element of the test is generally a fact question for the jury. Dicomes, 113 Wash.2d at 630, 782 P.2d 1002. However, it is initially for a court to determine as a matter of law whether "reasonable minds could differ on whether the conduct was sufficiently extreme to result in liability." Id.
Here, Ms. Robel's coworkers, and perhaps even her supervisors, subjected her to rough, insulting language and other indignities. But this conduct was not so extreme and outrageous as to be regarded as atrocious or intolerable. As a matter of law, reasonable minds could not differ on whether the conduct was so extreme as to result in liability.[7] The trial court erred in concluding Fred Meyer was liable for outrage.
The fourth issue is whether the superior court erred in concluding Fred Meyer was *1113 liable for negligent infliction of emotional distress. Washington law recognizes such a claim in the employment setting only in limited circumstances:
The utility of permitting employers to handle workplace disputes outweighs the risk of harm to employees who may exhibit symptoms of emotional distress as a result. The employers, not the courts, are in the best position to determine whether such disputes should be resolved by employee counseling, discipline, transfers, terminations or no action at all. While such actions undoubtedly are stressful to impacted employees, the courts cannot guarantee a stress-free workplace. Therefore, we hold that absent a statutory or public policy mandate, employers do not owe employees a duty to use reasonable care to avoid the inadvertent infliction of emotional distress when responding to workplace disputes.
Bishop v. State, 77 Wash.App. 228, 234-35, 889 P.2d 959 (1995) (footnote omitted).
For these reasons, Washington courts will not recognize a claim against an employer for negligent infliction of emotional distress that arises from a workplace dispute or an employee disciplinary matter, or "when the only factual basis for emotional distress [is] the discrimination claim." Chea v. Men's Wearhouse, Inc., 85 Wash.App. 405, 413, 932 P.2d 1261 (1997), review denied, 134 Wash.2d 1002, 953 P.2d 96 (1998); see Johnson v. Dep't of Soc. & Health Servs., 80 Wash.App. 212, 230-31, 907 P.2d 1223 (1996); Bishop, 77 Wash.App. at 235, 889 P.2d 959.
Here, Ms. Robel contends the harassment arose from various work-related sources, including her concerns about the deli's food-handling practices, her insistence on taking a 40 hour position that originally was given to Tiffany Ware, her workload, and her general frustration with the dysfunctional nature of the workplace. The boorish behavior and rough language of Ms. Robel's coworkers, even if with the knowledge or tacit approval of her supervisors, thus is not cognizable under Washington law. The trial court erred in concluding Fred Meyer was liable for negligent infliction of emotional distress.
The fifth and final issue is whether the superior court erred in concluding Fred Meyer defamed Ms. Robel. To make out a prima facie case of defamation, a plaintiff must establish "falsity, an unprivileged communication, fault, and damages." LaMon v. Butler, 112 Wash.2d 193, 197, 770 P.2d 1027, cert. denied, 493 U.S. 814, 110 S.Ct. 61, 107 L.Ed.2d 29 (1989). Initially, a court must determine as a matter of law whether a particular statement is capable of a defamatory meaning. Ernst Home Center, Inc. v. United Food & Commercial Workers Int'l Union, 77 Wash.App. 33, 44, 888 P.2d 1196 (1995).
The trial court's findings and conclusions regarding the defamation claim are based on coworkers' use of the words "bitch," "cunt," "fucking bitch," "fucking cunt," "snitch," "squealer," and "liar," and on the comment that only idiots demo.
Fred Meyer correctly points out that the vulgar names coworkers used to describe Ms. Robel are not capable of a defamatory meaning. The Restatement (Second) of Torts explains the difference between verbal abuse and defamatory statements:
There are some statements that are in form statements of opinion, or even of fact, which cannot reasonably be understood to be meant literally and seriously and are obviously mere vituperation and abuse. A certain amount of vulgar name-calling is frequently resorted to by angry people without any real intent to make a defamatory assertion, and it is properly understood by reasonable listeners to amount to nothing more. This is true particularly when it is obvious that the speaker has lost his temper and is merely giving vent to insult. Thus when, in the course of an altercation, the defendant loudly and angrily calls the plaintiff a bastard in the presence of others, he is ordinarily not reasonably to be understood as asserting the fact that the plaintiff is of illegitimate birth but only to be abusing him to his face. No action for defamation will lie in this case.
RESTATEMENT (SECOND) OF TORTS § 566, cmt. e (1977); see Ward v. Zelikovsky, 136 N.J. *1114 516, 643 A.2d 972 (1994) (statement that plaintiff is "bitch" not capable of defamatory meaning); Lee v. Metropolitan Airport Comm'n, 428 N.W.2d 815, 821 (1988) (same).
Here, the vulgarisms Ms. Robel's coworkers used, while undoubtedly crude and inappropriate, are not capable of defamatory meaning. The superior court erred as a matter of law in finding those statements were defamatory.
However, the court also relied on several other statements that arguably are capable of defamatory meaning, such as "snitch," "squealer," "liar," and "idiot." Those statements thus arguably would support a defamation claim.
Nevertheless, Ms. Robel presented no evidence and the trial court made no finding that she suffered reputational damage resulting from the statements. Generally in a defamation action, the plaintiff must present evidence of special or actual damages resulting from the statement. Purvis v. Bremer's, Inc., 54 Wash.2d 743, 747, 344 P.2d 705 (1959). An exception to this rule is libel per se, which permits an award of substantial damages without proof of actual damage. Michielli v. U.S. Mortgage Co., 58 Wash.2d 221, 227, 361 P.2d 758 (1961). A publication is libelous per se if it "tends to expose a living person to hatred, contempt, ridicule or obloquy, or to deprive him of the benefit of public confidence or social intercourse, or to injure him in his business or occupation." Purvis, 54 Wash.2d at 751, 344 P.2d 705. Here, the trial court made no finding that the coworkers' statements exposed Ms. Robel to hatred, contempt, ridicule, obloquy, deprived her of the benefit of public confidence, or injured her in her business or occupation. The court clearly did not view the statements as libelous per se.
In the absence of such a finding, and in the absence of any proof of actual damage resulting from the statements, the trial court erred in concluding Fred Meyer was liable for defamation.[8]
The court's findings and conclusions and its judgment are reversed. The case is remanded for further action consistent with this decision.[9]
KURTZ, C.J., and SWEENEY, J., concur.
NOTES
[1] Almost all of the trial witnesses, including management and Ms. Robel's coworkers, agreed the deli was "dysfunctional."
[2] Ms. Robel did not return to work after the leave.
[3] Fred Meyer apparently concedes Ms. Robel's industrial injury was a disability under RCW 49.60.180(3).
[4] Cases construing federal statutes prohibiting employment discrimination provide persuasive authority on the construction of corresponding provisions in the Law Against Discrimination. See MacSuga v. County of Spokane, 97 Wash.App. 435, 442, 983 P.2d 1167 (1999), review denied, 140 Wash.2d 1008, 999 P.2d 1259 (2000).
[5] Ms. Robel also argues Fred Meyer directly discriminated against her by refusing her request for a stool after her injury. However, the trial court expressly found that Ms. Robel "was never incapable of doing the essential functions of the light duty work without it."
[6] This conclusion makes it unnecessary to address Fred Meyer's additional arguments that the conduct cannot be imputed to the employer and that Ms. Robel essentially waived her claim by failing to make use of remedies available in the employee handbook or the collective bargaining agreement.
[7] This conclusion makes it unnecessary to consider whether Ms. Robel's emotional distress was sufficiently severe to result in liability for outrage.
[8] This conclusion makes it unnecessary to address Fred Meyer's argument that the court erred in holding it liable for the statements of its employees. Moreover, communications made only among corporate personnel have been held to be not published for the purposes of defamation. Prins v. Holland-North Am. Mortgage Co., 107 Wash. 206, 181 P. 680, 5 A.L.R. 451 (1919).
[9] Fred Meyer also has assigned error to the superior court's denial of its motion to dismiss on summary judgment. However, denial of a motion for summary judgment generally is not an appealable order. RAP 2.2(a); see Sea-Pac Co. v. United Food & Commercial Workers Local Union 44, 103 Wash.2d 800, 801-02, 699 P.2d 217 (1985). We thus do not address that issue.