**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| JAMIE LITVACK,<br><br>     Appellant,<br><br>  v.<br><br>UNIVERSITY OF WASHINGTON,<br><br>     Respondent. | No. 84592-6-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

MANN, J. — Dr. Jamie Litvack appeals the summary judgment dismissal of her gender discrimination claim under the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW, and 42 U.S.C. § 1981. Dr. Litvack argues that the trial court erred in ruling that she failed to provide sufficient evidence under the pretext prong of the burden shifting McDonnell Douglas[1] framework which requires she produce evidence of a genuine dispute over either (1) that the defendant's reason is pretextual or (2) that although the employer's stated reason is legitimate, discrimination nevertheless was a substantial factor motivating the employer.

Because the evidence shows competing inferences of discrimination and nondiscrimination, there is a genuine issue of material fact as to whether discrimination

---

[1] McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

was a substantial factor motivating the employment decision. We reverse the order granting summary judgment dismissal of the discrimination claim and remand to the trial court for further proceedings.

I

A

In early 2016, Dr. Litvack began discussing potential employment with Dr. Neal Futran, the director of head and neck surgery in the Department of Otolaryngology at the University of Washington's School of Medicine (Department and UW, respectively). On May 26, 2016, UW offered Dr. Litvack a 12-month appointment as acting assistant professor in the Department and the Veterans Affairs Puget Sound Health Care System (VA). Dr. Litvack accepted the appointment on June 11, 2016. Under the supervision of Dr. Futran, Dr. Litvack was required to divide her time between the VA, Harborview Medical Center (HMC), Eastside Specialty Clinic (ESC), and research, with the majority of her time split between Harborview and the VA. Her primary responsibilities were to provide general otolaryngology care at HMC and the VA while retaining the ability to pursue rhinology interests at both sites.

According to the offer terms, Dr. Litvack's 12-month appointment was effective though June 30, 2017, and then subject to renewal for the following academic year up to four academic years. The offer also explained the Department's expectation for a long and productive relationship:

> While this is an annual appointment subject to renewal each year, we expect that you will have a long and productive relationship with the University of Washington and our department. The Department is currently recruiting for a regular assistant professor position that is aligned with this acting position. We are very early in this process. We expect

you to be an extremely viable candidate for this position. As you are aware, candidates apply for these positions through a national search and we would encourage you to apply if this meets with your career goals.

In November 2016, Dr. Futran described Dr. Litvack as "starting quite well" and noted that she received "great compliments from faculty and staff about her participation and work" to the extent "we want to continue to foster this and commit to her future success." Dr. Futran described a "changing landscape" at HMC and the VA and suggested the best course would be to renew Dr. Litvack's appointment for one more year until the situation had settled. That same month, Dr. Futran recommended to renew Dr. Litvack's appointment for the 2017-2018 academic year.

From the outset, Dr. Litvack had concerns with the lack of representation of women in the Department and felt treated differently than in her previous professional experience. She testified:

> that it was pretty normal, unfortunately, during faculty meetings for the very few women in the room to be cut off, interrupted, talked over. Men would raise their voices. Women were condescended to. I would say I learned very quickly to stay quiet, because it was an opportunity to be undermined by my male colleagues.
> . . . .
> Trying to share my clinical experience and, again, advocate for the residents. And during this conversation, Jay Rubenstein turned to me and cut me off, talked over me, interrupted multiple times, said basically you don't know what you're talking about, little girl. And while he may not have said little girl out loud, the tone of voice was, you don't know what you're talking about, little girl.

Dr. Litvack also noted that scheduling and operating room time was an ongoing issue during her employment.

In March 2017, Dr. Greg Davis, the director of rhinology, notified Dr. Futran that he met with Dr. Litvack and learned of some of her frustrations:

I don't think she's feeling the support that most faculty would want. Kris is not giving her any block time at HMC (she has 2 four hour blocks per month) and her requests for equipment at the VA (i.e. an image guidance machine) continue to waffle, currently in the "no" category after they had initially said ye[s]. I think her frustration may be the bigger issue, not Zach's.

Any leverage you could put on Kris would likely be helpful for her HMC progress. I am sure Mark is doing his best at the VA.[2]

Dr. Futran responded supporting Dr. Litvack:

Thanks for this and I have been very impressed with [Litvack] and her willingness and effort to be a great faculty member. Personally I would love to move and make her regular faculty similar to what we did with Randy, but you express some of the issues clearly. I have been trying to get everyone to see how good she is to win support and maybe we can discuss some strategies to move this along.

In November 2017, Dr. Futran recommended renewal of Dr. Litvack's appointment for the 2018-2019 academic year.

In May 2018, Dr. Litvack began her practice at the ESC. Surgeries originating out of the ESC were performed at the UW Medical Center (UWMC). Through June 2018, however, Dr. Litvack claimed she primarily operated at HMC and her work at the ESC was minimal. Her recollection was she worked about 20 shifts at the ESC before her termination.

Dr. Litvack also coinitiated a diversity committee in the Department and presented on behalf of the committee at a faculty retreat in September 2018. She testified:

I had been working on research on gender gap and compensation at that time, and underrepresentation of women at editorial, editorial shifts in clinical—well, in otolaryngology journals in the background . . . I presented

---

[2] Referring to Dr. Kris Moe, the Department chief at HMC at the time.

> a presentation at our fall faculty meeting . . . and talked about the different elements of what we were concerned about.
>
> . . . .
>
> I asked to present in the morning, but it was pushed to late in the day. I wanted Mark Whipple to present the work because I knew it would be "safe" coming from his mouth rather than mine. He was out of town that day. I did not feel safe at the time, and when discussed further with Dr. Futran during the November 14, 2018 meeting, his response made it clear that I had offended him and others.

That same month, in front of faculty, Dr. Litvack told the head of the academic promotions committee that the promotion criteria was opaque and created opportunities for bias and discrimination thus disadvantaging female physicians and other underrepresented groups in the profession.

In October 2018, ESC Manager Rekha Matken e-mailed the ESC supervisor, Kevin Kiemele, and Dr. Eugene Yang, the ESC medical director, about Dr. Litvack:

> I think that things between her and the [medical assistants] are improving . . . she wants to see sinus patients, which is part of general ENT but sounds like the way it was presented to [the patient service specialist] is that it should be a number one priority . . . [Dr. Litvack] should get all the sinus patients first and then others.

Kiemele responded that while Dr. Litvack had input, "for her, it is first come first served from that list . . . while [Dr. Ian Humphrey]'s practice is intentionally focused on rhinology and sinus surgery, [Dr. Litvack]'s is focused on general ENT problems." Dr. Yang replied that he planned to meet with Dr. Futran soon about general otolaryngology at the ESC and questioned Dr. Litvack's "interactions with staff and expectations for her practice at ESC. I think we need to set clear boundaries before things get more off track."

On October 22, 2018, Kiemele updated Dr. Futran on Dr. Litvack's performance:

Lack of or inconsistent response to inquiries from nursing staff about patient care; staff are told she'll address them on Friday when she is there. This is not consistent with the expectation for all providers at ESC (or uwmc for that matter) and appears to be a continuation of the approach that she is unavailable and cannot be contacted nor will respond when on VA time. It also is alienating the nurse who was assigned to work with Jamie on Fridays and throughout the week, because the actual Oto nurse does not work Fridays. We do not want to alienate Cindy (the RN) after her acceptance to take on this one piece of Oto.

Unsanctioned narrowing of ENT conditions managed in her practice, evidenced by requests for staff to move patients off her schedule and to not schedule patients with problems other than nasal or sinus related. I asked Rekha not to submit any changes to the SOP at the contact center, to run those through when she does receive requests from our providers there and/or staff.

I also asked her to relay to Jamie that she should connect with you and I if she wants to discuss her clinical practice over there. . . .

What Rekha requested we NOT discuss—or at least not make it a big deal, are the issues reported around staff relations. Yes—it was bumpy at first, but they have been working with both Jamie and the team, and despite what Ian is hearing on Mondays, after the last clinic, Rekha pulled the MA in (after hearing it was a horrible day from Ian) and asked. And was told—best clinic yet! [It's] better. And we are learning how to work together. She thin[k]s fixing the [patient care communication issues] will fix much of this also.

During the first week of November 2018, the faculty voted on Dr. Litvack's appointment renewal for the 2019 academic year with 19 out of 21 voting for renewal.

On November 14, 2018, Dr. Yang notified Dr. Futran that he had ongoing difficulties with Dr. Litvack and chart closures at the ESC. That same day, Dr. Litvack met with Dr. Futran who summarized the discussion into five points: (1) research collaborations are going well, (2) spearheading the Department diversity committee, (3) clinical and educational efforts at the VA are going well, (4) practice at ESC has had slow start with several challenges, and (5) the acting assistant professorship cannot be

permanent and there is no clear path to become a "regular" assistant professor in the department. Dr. Futran listed the challenges at ESC: clinical productivity is far below target, issues with inadequate assistance, inconsistent response to nursing staff about patient care, issues implementing clinic procedures, and documentation issues. Dr. Litvack testified that "this wasn't a conversation. This was him yelling and screaming at me . . . he was just very angry."

Dr. Litvack testified that she did not remember speaking with Dr. Futran about her productivity being below target before this meeting. Instead, Dr. Litvack testified she was told in early 2018 by Michelle Doyle, vice chair of administration for the Department, that there was no problem with her RVUs.[3] Dr. Litvack testified about her productivity at the ESC:

> I was disproportionately required to see non-surgical and medical otology patients that are important for the system, important for the care of patients, but do not provide the same RVU value. I was disproportionately required to take care of these medical and medical otology patients, the non-surgical patients, when I moved to the [ESC], so much so that patients that came in for sinus care could not make appointments with me and were often redirected towards Dr. Humphreys.

Dr. Litvack also pointed to the lack of experienced support staff available to her at the ESC which made it harder for her to get documentation done on time. For example, "Dr. Humphreys had a well-trained medical assistant who understood not just otolaryngology, but rhinology, and that he had access to an onsite nurse. I had an untrained medical assistant with no otolaryngology, or very little otolaryngology experience, and no nurse." Additionally, Dr. Litvack claims the surgery scheduler

---

[3] Relative value units (RVUs) are used to measure physician productivity.

disproportionately favored male colleagues Dr. Davis and Dr. Humphreys in terms of response time, attitude, and patient care.

Dr. Litvack testified on why she tried to change her clinic schedule template to send sinus surgery patients to her as a priority:

> what was happening in the context of that [request] is that the sinus patients were being diverted from me and directed towards my male colleagues. And very logically, when my schedule is booked out with non-surgical and medical otolaryngology, it seems only appropriate that for patient access they go to the next available . . . I also had direct referrals that were sent to me that were then redirected to Dr. Humphreys.

On November 18, 2018, Dr. Davis asked Dr. Litvack to present an epistaxis case from the week before at the November Quality Improvement (QI) meeting.[4] Dr. Litvack responded:

> Good idea . . . Briefly, he's a 59 yo man with epistaxis, chronic anticoagulation on xarelto for chronic DVTs. Presented as a new clinic patient on 11/09/18 for removal of rhino rockets after two failed rhino rockets at local ED. At presentation, he had been bleeding on and off since 4 am and had passed out 3x in last 3 days. Attempted to manage epistaxis in out patient unsuccessfully. Packed nose bilaterally and sent to local ED.
>
> Opportunity to discuss:
>
> -Triage skill sets & types of clinical resources needed to see an ENT patient in a stand alone clinic.

Dr. Davis forwarded her response to Dr. Humphreys stating, "it does not appear she felt that her medical decision making is part of the QI issue nor sending the patient away to a non-UW ED." The QI meeting took place on November 21, 2018. Dr. Litvack testified

---

[4] Epistaxis is a nosebleed. MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/epistaxis (last visited Apr. 22, 2024). The goal of QI meetings is not punitive but to improve patient care and processes to achieve better outcomes. Every faculty member has had cases presented at QI meetings for various reasons.

that, more than once, female surgeons with cases presented at QI meetings were treated differently than male colleagues with cases presented. Male colleagues undermined the clinical judgment of female surgeons "in a very personal way."

On November 22, 2018, Dr. Davis contacted Dr. Futran and Dr. Albert Merati, the Department's chief at UWMC, to express concerns about Dr. Litvack and recommended against her renewal:

> There have been several concerning issues that I have been told about by others, but for this email I want to focus on the discussion at QI Conference today regarding the epistaxis patient she managed at the ESC. Today at conference, and also during an after-conference discussion I had with her and Mark Whipple, she demonstrated a significant level of poor medical decision making and most concerning a complete lack of responsibility and ability to ask for help when needed. She placed blame on the system, specifically referencing the lack of her having a nurse to help and not having proper supplies to manage the epistaxis. At no point, even after I asked her what she would do differently in the future, did she offer any alternative plan. When I suggested to her that she could have admitted the patient, consulted Hematology, and then taken the patient to the OR later that day she stared at me and said, "I guess I could have called our doc-of-the-day". I replied that she should be able to manage this patient, and if needed, should keep in mind that cancelling clinic and taking a patient to the OR is always an option. It further concerns me that she did not ask for help with this case and only presented this case at [QI] Conference because I emailed her requesting that she do so. Her poor decision making at the beginning is very concerning, specifically deciding to pull the nasal packs in a coagulopathic patient when she (in her opinion) did not have the proper equipment to manage that encounter. Finally, her decision to put this patient in an ambulance and send them to a local non-UW ED to let the community ED providers and community OTO provider on call manage this patient further shows a lack of expertise and poor medical decision making.
>
> I can only imagine how hard it would be to let a faculty member go. However, she has repeatedly provided evidence that she should not be providing tertiary nor in my opinion secondary rhinology care.

In response, Dr. Futran sought feedback about Dr. Litvack from male colleagues, Dr. Merati and Dr. Humphreys, who shared concerns about Dr. Litvack's capability and clinical judgment.

In contrast, Dr. Litvack described the epistaxis case as consistent with ESC practices:

> I evaluated a new patient on an irreversible blood thinner who presented with spontaneous epistaxis while at home. This was not an established patient of the Department, nor had this patient undergone surgery by myself nor any of my former partners. It was, and remains, my professional medical opinion that this patient should have been directed by ESC staff to an emergency room when they called to make an appointment. It furthermore remains my professional medical opinion and standard of care that a patient on irreversible blood thinners with ongoing epistaxis requires intervention beyond the scope of what is typically available in a stand-alone clinic setting. When I had the opportunity to evaluate this patient face to face, I had a professional obligation and committed to care for him to the best of my ability.
>
> Based on the precedent at ESC that patients with urgent/emergent issues were sent to the closest emergency room, a precedent set prior to my practice at the ESC clinic, I complied with the ESC practices and also made the real-time decision that it was in the patient's best interest to be sent to the closest emergency room. No harm came to this patient as a direct result of my actions or decision making.

In December, Dr. Futran recommended not to renew Dr. Litvack's appointment due to information he gathered after the vote. Dr. Futran gave these reasons for his recommendation:

1. This vote occurred prior to information gathered in my one on one meeting with Dr. Litvack, my meeting with Dr. Eugene Yang, medical director of the ESC where practices, patient care issues identified through our quality improvement conference, and independent faculty discussions in her field. If the information below was known to the faculty it would have very likely resulted in a negative vote.

2. Dr. Litvack's practice at the Eastside specialty center illustrated several challenges.

a. Her clinical productivity is far below target and has thus far yielded few surgical cases. This is despite a mandate to see general otolaryngology patients and necessity to fill her templates.

b. She has had significant challenges with her support team, specifically medical assistants and nurses. This includes poor communication, non-collaborative attitudes, poor responsiveness to patient care issues when not on site, shift of physician responsibilities to staff, and lack of developing a system with them for timely communication.

c. Dr. Litvack's subspecialty is rhinology for which we have a division director, Dr. Greg Davis. She has tried to implement procedures unique to this subspecialty without communicating and receiving guidance through division channels resulting in dissatisfaction among patients, staff, and Dr. Litvack herself.

d. She is consistently not closing her encounters in a timely manner.

3. Dr. Litvack's patient care decisions have come in to question through our quality improvement process resulting in a lack of confidence of her decision members to deliver tertiary rhinology care . . .

4. Dr. Litvack is currently an acting assistant professor in the department. Based on the above issues, there is no clear path for her to become a "regular" assistant professor and further activity will not change this.

Dr. Futran testified that a factor in his nonrenewal decision was his personal evaluation

of Dr. Litvack:

> what was lacking, and, again, was part of my decision, was her personal acknowledgement of her contributions to that particular complaint, her responsibilities and ability for her to help improve upon those complaints, and putting the responsibility, unfortunately, on everyone else.
>             . . . .
> it wasn't a matter of attitude; it's a matter of acknowledgement in the faith as a chair that I have in an individual to apologize and make—and try to help commence those changes.
>             . . . .
> One of the determinants as I said I need is her willingness to acknowledge that it's something that she needs to work on versus the system.

On December 21, 2018, Doyle e-mailed Dr. Futran about Dr. Litvack:

> I got to thinking about the conversation with [Dr. Litvack] and a possible approach we could take to deliver the message. Maybe you are already considering this . . .

The proposed new positions we spoke about today for a Clinical Assistant Professor (general Oto) and an academic Assistant Professor (fellowship trained rhinologist) represent our vision and decision for expanding permanent faculty to best meet our current and future demand. The new positions replace and reconfigure the deployment allocated to the acting assistant appointment and therefor it will not be renewed . . .

Jamie can apply for either position but would need to demonstrate significant improvement in order to be considered for an interview. . . .

Although there are performance issues this is really a business decision.

Dr. Futran also stated: "I really think though I need to give her the message that there is no opportunity to continue here even with change."

Dr. Litvack met with Dr. Futran on December 26, 2018, and he notified her of her termination. Dr. Litvack told Dr. Futran that he had issues with women and linked his decision to terminate her to both her being a woman and his broader issues with discriminating against women and underrepresented minorities in medicine.

The next day, Dr. Merati e-mailed Dr. Futran about Dr. Litvack's performance:

I have serious concerns about [Dr. Litvack] and her early performance in the UW OR (an early case from this ? summer) – I heard reports from other practitioners and also from an OR RN about her being in over her head on a case. There are few cases being generated out of practice that [Dr. Humphreys] and [Dr. Houlton] have more successfully navigated (not sure if this is her or the situation, but I suspect it is her) and finally this major incident that came to light a[t] grand rounds.

In February 2019, Dr. Litvack spoke to Dr. Futran about her intention to stay on at the VA after her acting professorship ended to which Dr. Futran told her that was not an option. Dr. Litvack testified:

I said what if I continue to work at the VA or try to work at the VA? And he said, I will make it extremely difficult for you . . . I would take away your clinical faculty appointment, I would prevent you from being able to work with the residents, and I would make it an extremely difficult place for you to work.

-12-

The VA told Dr. Litvack it would do whatever Dr. Futran instructed. Dr. Litvack's appointment ended on June 30, 2019. UW posted two open positions in late 2019, an associate professor of otolaryngology and an assistant professor of otolaryngology. Both positions were filled by male doctors.

B

On November 16, 2020, Dr. Litvack sued UW seeking damages and alleging discrimination and retaliation in violation of the WLAD and the Equal Pay and Opportunities Act (EPOA). The parties cross moved for summary judgment. Dr. Litvack sought partial summary judgment and dismissal of UW's affirmative defenses of mitigation and bona fide job-related factors consistent with business necessity. UW sought summary judgment and dismissal of all of Dr. Litvack's claims.

The trial court denied UW's motion as to the WLAD retaliation claim. The court granted UW's motion as to the WLAD discrimination claim and the EPOA discrimination claim, dismissing both. The court granted Dr. Litvack's motion dismissing the affirmative defense for failure to mitigate, and denied her motion on the bona fide job-related factors.

At trial, the jury found for UW and rejected Dr. Litvack's WLAD retaliation claim.

Dr. Litvack appeals the summary judgment dismissal of the WLAD discrimination claim. Dr. Litvack does not appeal the jury verdict rejecting her WLAD retaliation claim.

II

Dr. Litvack argues that the trial court erred in granting summary judgment and dismissing her claims for discrimination under the WLAD. Specifically, Dr. Litvack

argues that numerous fact questions related to the third prong of the McDonnell Douglas framework preclude summary judgment. We agree.

We review a trial court's grant of summary judgment de novo. Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas County, 189 Wn.2d 516, 526, 404 P.3d 464 (2017). Summary judgment is properly granted when the pleadings, affidavits, depositions, and admissions on file demonstrate there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). We consider all facts and reasonable inferences in the light most favorable to the nonmoving party—here, Dr. Litvack. Mikkelsen, 189 Wn.2d at 526.

A

"WLAD prohibits employers from discharging any employee on the basis of a protected characteristic, including age and gender." Mikkelsen, 189 Wn.2d at 526; RCW 49.60.180. Intentional discrimination is difficult to prove, however, because "[d]irect, 'smoking gun' evidence of discriminatory animus is rare, since '[t]here will seldom be "eyewitness" testimony as to the employer's mental processes.'" Mikkelsen, 189 Wn.2d at 526 (quoting Hill v. BCTI Income Fund-I, 144 Wn.2d 172, 179, 23 P.3d 440 (2001), abrogated in part by Mikkelsen, 189 Wn.2d 516). Because intentional discrimination is difficult to prove, Washington follows the three-part evidentiary burden-shifting formula set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Mikkelsen, 189 Wn.2d at 526. "'The shifting burdens of proof set forth in McDonnell Douglas are designed to assure that the plaintiff [has] his [or her] day in court despite the unavailability of direct evidence.'" Mikkelsen,

189 Wn.2d at 526 (quoting Hill, 144 Wn.2d at 179). The McDonnell Douglas burden shifting framework has three steps, or prongs:

> First, the plaintiff must make a prima facie case of discrimination by showing that (1) she was within a statutorily protected class, (2) she was discharged by the defendant, (3) she was doing satisfactory work, and (4) after her discharge, the position remained open and the employer continued to seek applicants with qualifications similar to the plaintiff. If the plaintiff establishes a prima facie case, it creates a rebuttable presumption of discrimination.

> Second, the burden shifts to the defendant, who must "articulate a legitimate, nondiscriminatory reason for the adverse employment action."

> Third, if the defendant meets this burden, the plaintiff must produce sufficient evidence showing that the defendant's alleged nondiscriminatory reason for the adverse employment action was a pretext.

Mikkelsen, 189 Wn.2d at 527 (citations omitted).

The trial court found that Dr. Litvack met the first prong and established a prima facie case of gender discrimination. The court also found that UW met the second prong and produced evidence of legitimate nondiscriminatory reasons for not renewing Dr. Litvack's appointment.[5] At issue is step three: whether Dr. Litvack produced evidence that UW's asserted nondiscriminatory reasons were merely a pretext. The trial court found that Dr. Litvack presented no evidence creating a genuine issue of fact on whether (1) Dr. Futran's reasons were merely a pretext for a discriminatory purpose or (2) even though Dr. Futran's reasons were legitimate, discrimination still was a substantial factor motivating his decision.

---

[5] Dr. Litvack does not challenge the trial court's finding on prong two.

Dr. Litvack argues that summary judgment was not appropriate because there was evidence of competing inferences of both discrimination and nondiscrimination which satisfies the pretext prong.

B

Our Supreme Court explained what is required for an employee to satisfy the pretext prong in Scrivener v. Clark College:

> An employee may satisfy the pretext prong by offering sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is pretextual or (2) that although the employer's stated reason is legitimate, discrimination nevertheless was a substantial factor motivating the employer.
>
> An employee does not need to disprove each of the employer's articulated reasons to satisfy the pretext burden of production. Our case law clearly establishes that it is the plaintiff's burden at trial to prove that discrimination was a substantial factor in an adverse employment action, not the only motivating factor.

181 Wn.2d 439, 446-47, 334 P.3d 541 (2014) (citations omitted).

"Summary judgment for an employer is seldom appropriate in employment discrimination cases because of the difficulty of proving discriminatory motivation." Mikkelsen, 189 Wn.2d at 528. "To overcome summary judgment, the plaintiff needs to show only that a reasonable jury could find that discrimination was a substantial factor in the employer's adverse employment action." Mikkelsen, 189 Wn.2d at 528 (emphasis added).[6] "A 'substantial factor' means that the protected characteristic was a significant motivating factor bringing about the employer's decision." Scrivener, 181

---

[6] Our Supreme Court adopted the "substantial factor" test for proving discrimination cases under the WLAD in Mackay v. Acorn Custom Cabinetry, Inc., 127 Wn.2d 302, 310, 898 P.2d 284 (1995). In doing so the court recognized that "Washington's disdain for discrimination would be reduced to mere rhetoric if this court were to require proof that one of the attributes enumerated in RCW 49.60.180(2) was a 'determining factor' in the employer's adverse employment decision."

Wn.2d at 444.  The protected characteristic need not be the sole factor in the decision.  Scrivener, 181 Wn.2d at 444.  A significant motivating factor means that the employment decision was more likely than not motivated by discriminatory reasons.  See Fell v. Spokane Transit Auth., 128 Wn.2d 618 n.32, 911 P.2d 1319 (1996) (citing Texas Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 256, 101 S. Ct. 1089, 1095, 67 L. Ed. 2d 207 (1981)).

Because an employer may be motivated by both legitimate and illegitimate reasons, an employee need only present evidence sufficient to create a genuine issue of material fact as to whether discrimination was a substantial motivating factor.  Mikkelsen, 189 Wn.2d at 534.  A plaintiff need not "disprove each of the employer's articulated reasons."  Mikkelsen, 189 Wn.2d at 534 (citing Scrivener, 181 Wn.2d at 447).  "Plaintiffs may rely on circumstantial, indirect, and inferential evidence to establish discriminatory action."  Mikkelsen, 189 Wn.2d at 526.  But an employee must do more than express an opinion or make conclusory statements; the facts must be specific and material.  Crabtree v. Jefferson County Pub. Hosp. Dist. No. 2, 20 Wn. App. 2d 493, 510, 500 P.3d 203 (2021).  "An employee's assertion of good performance to contradict the employer's assertion of poor performance does not give rise to a reasonable inference of discrimination."  Chen v. State, 86 Wn. App. 183, 191, 937 P.2d 612 (1997).

C

Dr. Litvack asserts that the trial court erred in several respects that she claims contributed to its erroneous dismissal of her claim.  We address each in turn.

1

Relying on Scrivener, Dr. Litvack argues that the trial court applied the wrong legal standard in concluding that her evidence that UW's reasons were pretextual had "no basis in fact." This is error, Dr. Litvack contends, because under Scrivener, a plaintiff "may also satisfy the pretext prong by presenting sufficient evidence that discrimination nonetheless was a substantial factor motivating the employer." We disagree that the trial court applied the wrong legal standard.

The trial court explicitly stated the two-part pretext prong as outlined by Scrivener: that the defendant's evidence was pretextual; or that although employer's stated reason was legitimate, discrimination was as substantial motivating factor. The trial court then addressed Dr. Litvack's evidence of pretext, and whether discrimination was a substantially motivating factor. Contrary to Dr. Litvack's assertion that the court only considered whether she showed UW's reasons had no basis in fact, the court evaluated prong three as outlined by Scrivener.

2

Dr. Litvack argues the trial court erred in rejecting the circumstantial evidence of disparate treatment of similarly situated employees. We agree.

"One test for pretext is whether (1) an employee outside the protected class (2) committed acts of comparable seriousness (3) but was not demoted or similarly disciplined." Johnson v. Dep't of Soc. & Health Servs., 80 Wn. App. 212, 227, 907 P.2d 1223 (1996); Scrivener, 181 Wn.2d at 448 (employer's reason "was not a motivating factor in employment decisions for other employees in the same circumstances"). As the Supreme Court explained in McDonnell Douglas as to racial discrimination:

> Especially relevant to such a showing would be evidence that white employees involved in acts against petitioner of comparable seriousness to the 'stall-in' were nevertheless retained or rehired. Petitioner may justifiably refuse to rehire one who was engaged in unlawful, disruptive acts against it, but only if this criterion is applied alike to members of all races.

411 U.S. at 804. The appropriate comparators are employees that are "similarly situated" to the plaintiff and doing "substantially the same work" as the plaintiff. Johnson, 80 Wn. App. at 227; Ellington v. Spokane Mortg. Co., 19 Wn. App. 48, 54, 573 P.2d 389 (1978).

Dr. Litvack presented several comparators to support her discrimination claim. For example, in the three months before her termination, Dr. Litvack's male colleague at the ESC, Dr. Jeffrey Houlton, had far greater overall lag-time in completing his charts. His open notes reached 50, compared to Dr. Litvack's 9 during this same period. While Dr. Futran asked Dr. Houlton to "please pay attention to this," he received no adverse employment action.

Similarly, Dr. Davis's lag-time was slightly less than Dr. Litvack's but his open notes were greater at 30, compared to Dr. Litvack's 9. Dr. Davis was also widely known for speaking down to others and refusing to accept feedback. There is no indication that Dr. Davis received any criticism.

The trial court recognized that Dr. Litvack produced evidence that other doctors were treated differently:

> Dr. Litvack has produced some evidence that Dr. Davis exhibited some of the same behaviors as Dr. Litvack—communication issues and delinquent encounter closures—and that he was not accepting or welcoming of feedback. Dr. Litvack also produced some evidence that Drs. Weaver and Houlton had documentation issues similar to, but not the same as, Dr.

-19-

Litvack's. Dr. Litvack produce evidence that Drs. Barber and Weymuller did not make their productivity targets.

But the court determined this evidence insufficient because the comparators were permanent professors and Dr. Litvack was an acting professor subject to yearly renewal:

> It is undisputed, however, that these employees were in permanent, not acting, positions. Dr. Davis was an associate professor, Dr. Houlton was an assistant professor, and Dr. Weaver was a professor. Dr. Barber was an assistant professor and is female. Dr. Weymuller was a full professor.
>
> Because Dr. Litvack was an acting professor subject to yearly renewal, her proposed comparables are not employees in the same circumstances.

The trial court erred in dismissing Dr. Litvack's comparators. The test for comparators is whether they are "similarly situated" to the plaintiff and "doing substantially the same work" as the plaintiff. Johnson, 80 Wn. App. at 227; Ellington, 18 Wn. App. at 54. In determining pretext comparators, it is not dispositive that acting professorships are subject to yearly renewal while assistant professorships are permanent, particularly where the comparators are other doctors in the same department performing similar work as Dr. Litvack. Excluding comparators based on their permanent versus annual renewal basis implies that permanent professorships are not subject to the same policies, procedures, and standards of care as acting professorships or, worse, that it is acceptable to discriminate against acting professors but not permanent professors. Nothing in the record supports such an inference and disregarding comparator evidence under these circumstances makes little sense. Turning summary judgment on narrow distinctions defeats the "fundamental concept of

allowing discrimination claims to be decided on the merits." Johnson, 80 Wn. App. at 230.

Because some of the provided comparators were male UW doctors in the Department, doing the same type work as Dr. Litvack, who committed acts of comparable seriousness, the trial court erred in excluding those doctors as comparators for evaluating evidence sufficient to satisfy the pretext prong.

3

Dr. Litvack argues the trial court erred in ruling that temporal evidence was only relevant to the retaliation claim because her gender was static throughout her employment with UW. We agree.

Dr. Litvack presented evidence that in the months before her termination, she became more outspoken about gender equity at UW. She challenged the male head of the academic promotions committee about gender bias at a faculty meeting. Additionally, Dr. Litvack gave a presentation at a faculty retreat on the work of the diversity committee which focused on the gender gap and compensation and the underrepresentation of women. About two months later, Dr. Futran yelled and screamed at Dr. Litvack during a performance review. That was also the first time Dr. Litvack was told she had productivity issues. Soon after, Dr. Futran recommended, against a majority vote, that Dr. Litvack's appointment not be renewed finding no path for her to become an assistant professor "and further activity will not change this."

The court did not consider Dr. Litvack's temporal evidence for her discrimination claim because the court believed her gender was static throughout her employment.

> Plaintiff's temporal evidence can be relevant only to her retaliation claim because her gender was a static factor throughout her employment, and it is undisputed that Dr. Futran acted in support of Dr. Litvack for two years immediately preceding his decision to not renew her acting appointment.
>     . . . .
> At oral argument, Dr. Litvack pointed out [November 2018 events] relative to her "protected activities" is circumstantial evidence that Dr. Futran secretly solicited these criticisms. While a jury could possibly find this to be true for her retaliation claim, this evidence is not relevant to her claim of gender discrimination because her gender remained the same from Dr. Futran's hiring of her, his support and commendation of her, through his non-renewal decision.

The trial court erred.

In Mikkelsen, for example, Mikkelsen and her male manager worked well together at first to the extent that he would have Mikkelsen act as acting manager when he was away from the office. 189 Wn.2d at 523. But the relationship deteriorated because of the manager's unilateral management style and his treatment of Mikkelsen such as talking over her and calling her untrustworthy in meetings. Mikkelsen, 189 Wn.2d at 522. The situation escalated to the point that Mikkelsen suggested to the board president that they conduct an anonymous survey to see if other employees had similar issues. Mikkelsen, 189 Wn.2d at 524. The manager found out about the survey and promptly fired Mikkelsen. Mikkelsen, 189 Wn.2d at 524. The manager's reasons for termination were that Mikkelsen disrespected him regularly, made unreasonable requests, and kept information about billing from him. Mikkelsen, 189 Wn.2d at 524. Our Supreme Court considered all the evidence together and determined that Mikkelsen presented "a genuine dispute of material fact as to whether the breakdown in communication between Mikkelsen and Ward occurred because she is a woman." Mikkelsen, 189 Wn.2d at 524. Thus, the court reversed summary judgment for the

employer because a reasonable jury could believe the manager was motivated by gender bias or they could believe the manager's legitimate reasons. Mikkelsen, 189 Wn.2d at 524.

Like Mikkelsen, it is possible that Dr. Futran could support Dr. Litvack initially and still be substantially motivated by discrimination in making his decision about nonrenewal. Dr. Litvack argues she was discriminated against not only because she is a woman but because she is a woman who refused to stay quiet.[7] Thus, a reasonable jury could believe Dr. Futran was motivated by gender bias or they could believe his legitimate reasons. Just because evidence may be used to support a retaliation claim does not mean it cannot also be used to support a discrimination claim arising from the same circumstances. For these reasons, the trial court should have considered any relevant and admissible evidence regardless of its temporal nature in determining whether there is a genuine issue of material fact as to pretext or whether discrimination was a substantial factor in the nonrenewal decision.[8]

4

Dr. Litvack argues the trial court erred in ruling that UW was entitled to the "same actor inference" which is a strong inference that when an employee is hired and fired by

_____

[7] Wash. Ct. of Appeals oral arg., Litvack v. Univ. of Wash., No. 84592-6-I (Nov. 14, 2023), at 18 min., 35 sec., https://tvw.org/video/division-1-court-of-appeals-2023111165/.

[8] UW argues that Dr. Litvack should be precluded from relying on temporal evidence under collateral estoppel because the jury in the retaliation claim trial determined whether Dr. Litvack proved "a substantial factor in the decision to non-renew her employment was Dr. Litvack's opposing what she reasonably believed to be discrimination." Collateral estoppel prevents relitigating a particular issue in a later proceeding involving the same parties even though the later proceeding involves a different claim or cause of action. 14A DOUGLAS J. ENDE, WASHINGTON PRACTICE: CIVIL PROCEDURE § 35:32 (3d ed. 2018).

The issue before us is whether summary judgment was proper on the WLAD discrimination claim. Dr. Litvack's WLAD discrimination claim is not being relitigated nor is this a later proceeding where Dr. Litvack is alleging discrimination under a different claim or cause of action.

the same decision maker, the adverse action is not based on any attribute that was known at the time of hiring. We agree.

Our Supreme Court recognized the same actor inference in Hill, 144 Wn.2d at 189-90.[9] In Hill, the employee alleged wrongful discharge due to age, where the same decision makers had authority over both the employee's hiring and their firing less than a year later. 144 Wn.2d at 189-90. Our Supreme Court stated that for the plaintiff to prevail under such circumstances, the "evidence must answer an obvious question: if the employer is opposed to employing persons with a certain attribute, why would the employer have hired such a person in the first place?" Hill, 144 Wn.2d at 189-90. The record in Hill failed to suggest an answer. 144 Wn.2d at 190.

Here, the trial court determined that certain evidence was irrelevant because Dr. Litvack's gender was the same from hiring to firing. Dr. Litvack does not dispute that Dr. Futran supported her at first and during most of her employment. But unlike the plaintiff in Hill, Dr. Litvack explains that discrimination occurred not only because she is a woman, but because she is a woman who spoke out on gender discrimination to the alleged offense of Dr. Futran and others.[10] Dr. Litvack's gender may be static, but her conduct, namely her assertiveness and outspoken opposition to gender bias in the Department, during her employment was not. And Dr. Futran considered her conduct, such as her unwillingness to apologize, in his decision-making. Dr. Litvack argues that

---

[9] Our Supreme Court gave the following rationale for the inference: "[u]nless the strength of this inference is fully recognized, employers could be discouraged from hiring the very persons the Legislature intended the Law Against Discrimination to protect, fearful that doing so would make them more vulnerable, rather than less, to legal claims of unlawful discriminatory animus if legitimate business reasons later required discharging such a person." Hill, 144 Wn.2d at 190.

[10] Wash. Ct. of Appeals oral arg., supra, at 18 min., 35 sec.

under such circumstances, the same actor inference makes little sense particularly as applied to an entity such as UW where it would be nearly impossible to not hire women in general.[11]  We agree.

While the same actor inference is strong, it is not dispositive when the employee provides an answer to the question posed in Hill as Dr. Litvack did here.  An employer is not entitled to summary judgment when the strength of the evidence overcomes the inference.

The trial court erred in applying the same actor inference without considering Dr. Litvack's explanation and weighing the evidence against the inference accordingly.

5

Citing Mikkelsen, Dr. Litvack argues that where, as here, "there are reasonable but competing inferences of both discrimination and nondiscrimination, it is the jury's task to choose between such inferences,—not the court's."  189 Wn.2d at 536 (internal quotation marks omitted).  Dr. Litvack contends that she provided sufficient evidence to support a reasonable inference of discrimination.  We agree.

Dr. Litvack may rely on circumstantial, indirect, and inferential evidence and need not disprove each of UW's reasons for nonrenewal.  Dr. Litvack need not prove her gender was the sole factor behind the nonrenewal.  Rather, Dr. Litvack need only provide sufficient evidence from which a jury could find that gender significantly motivated Dr. Futran's decision.  She has met that burden.

---

[11] Wash. Ct. of Appeals oral arg., supra, at 19 min., 15 sec.

Dr. Litvack stated that following her assertiveness and outspoken opposition to gender bias in the Department, she met with Dr. Futran for a performance review during which he was angry, yelled at her, cut her off, and behaved in a difficult and shocking manner. The same day as the meeting and soon after, Dr. Futran received and solicited feedback about Dr. Litvack from male colleagues who all expressed doubts as to her medical judgement. Then, Dr. Futran went against a majority vote and recommended against renewal.

The fact that Dr. Futran supported Dr. Litvack at certain times does not preclude the possibility that his decision was significantly motivated by discrimination against Dr. Litvack as a woman and a woman who spoke out and refused to apologize. Dr. Futran considered Dr. Litvack's conduct in his decision-making, including her willingness or ability to apologize and begin necessary changes. But Dr. Litvack was told only of performance issues in November and Dr. Futran's nonrenewal recommendation occurred in December. Dr. Litvack had very little time to commence changes or adjust her performance according to feedback as Dr. Futran wished. Dr. Futran also said that further activity would not change his determination that based on Dr. Litvack's performance issues there was no path for her to become a permanent professor.

Dr. Litvack provides more than opinion or conclusory statements in rebuttal to UW's purported reasons for termination—instead she provides specific facts. For example, in response to UW's assertion that she refused to see nonspecialty patients and her productivity was far below target, Dr. Litvack explained that she did not refuse to see patients but that because she was scheduled disproportionately with nonsurgical and lower RVU generating patients, sinus patients were being diverted to male

-26-

colleagues and so she tried to change her schedule to prioritize sinus surgery patients (presumably to generate more RVUs). E-mails between ESC staff and management confirm that a male colleague's practice intentionally focused on sinus surgery, while Dr. Litvack's practice focused on general ENT problems. Compounding this issue, at least at first, were referrals being missed because her photo was missing from the UW website thus causing scheduler confusion. Other communications between Dr. Futran and others reveal that scheduling and productivity were not necessarily within Dr. Litvack's control.

In response to the open encounters issue, Dr. Litvack stated that it was hard to get her records signed in time due to lack of resources as in quantity and quality of staff in comparison to support given to her male colleague. The otolaryngology nurse did not work on Dr. Litvack's clinic day but the record shows time and resources were spent by Dr. Litvack and others to train staff and work together. The record also shows that relations between Dr. Litvack and the staff were improving and Dr. Litvack explained why it was hard to reach her when she was away from ESC because of a cell phone "dead spot" at the VA.

In response to the epistaxis patient treatment presented at the QI meeting, Dr. Litvack explained her medical judgment and reasoning, that the patient was not harmed by her actions, and that during QI meetings male doctors often undermined the clinical judgment of female doctors. The day after the QI meeting, Dr. Davis e-mailed Dr. Futran about Dr. Litvack's performance with the patient which included these descriptions: "significant level of poor medical decision making," "poor decision making," "lack of expertise," "poor medical decision making," and "repeatedly provided evidence

-27-

that she should not be providing . . . rhinology care." In response, Dr. Futran sought feedback about Dr. Litvack from male colleagues Dr. Merati and Dr. Humphreys who shared similar concerns about her capability and clinical judgement in complex cases.

Significantly, Dr. Litvack's work at ESC was only a small portion of her practice and where she worked about 20 shifts during her professorship. Even so, Dr. Futran explained that based on Dr. Litvack's performance issues, most of which involved her work at ESC, there was no option for her to become permanent faculty and "further activity will not change this."

Dr. Litvack's burden at summary judgment is one of production, not persuasion. Scrivener, 181 Wn.2d at 445. Taken together and viewed in the light most favorable to Dr. Litvack, the evidence supports reasonable inferences of both discriminatory and nondiscriminatory motivations meaning a jury must determine the true motivation. Mikkelsen, 189 Wn.2d at 528. A jury could believe Dr. Futran decided against renewal because Dr. Litvack refused to stay quiet and she was an outspoken and assertive woman who challenged his and the Department's gender stereotypes, or because Dr. Futran harbored no gender bias and there simply was no path forward to a permanent professorship.

Because there is a genuine issue as to whether discrimination was a substantial factor motivating the nonrenewal decision, the trial court erred in determining Dr. Litvack did not provide sufficient evidence under the pretext prong to preclude summary judgment. We reverse the order granting summary judgment dismissal of the discrimination claim and remand to the trial court for further proceedings.

_Mann, J._

WE CONCUR:

_Feldman, J._                    _Díaz, J._